UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SUSAN MOUNT,                  :
       Plaintiff,      :
                       :
v.                            :   Civil Action No. : 3:04-CV-30152 MAP
                       :
ZALE DELAWARE, INC.,          :
       Defendant.      :

### DEFENDANT'S STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, Zale Delaware, Inc., has moved for summary judgment with respect to all counts of plaintiff's Complaint in this employment discrimination action. There is no genuine dispute as to the following facts:[1]

    1.    Defendant, Zale Delaware, Inc., ("Defendant" or "Zale") is a wholly owned subsidiary of Zale Corporation, North America's largest specialty retailer of fine jewelry, operating over 2,300 retail locations throughout the United States, Canada, and Puerto Rico, as well as through the Internet. Zale Delaware, Inc. is the parent company for several subsidiaries and operating divisions which operate as Zales Jewelers, Zales Outlet, Gordon Jewelers, Bailey Banks & Biddle Fine Jewelers, and Piercing Pagoda brands. Pertinent to the present action, Zale operates the Zales Outlet in Lee, Massachusetts, at which the plaintiff was employed.

    2.    Plaintiff, Susan Mount ("Plaintiff" or "Mount") commenced her employment with Zale in or about June of 1999 as a sales associate and became Store Manager of the Lee Zales Outlet on July 29, 1999. (Complaint at 1, ¶ 4.)

    3.    As store manager, plaintiff was responsible for, among other things, "managing all activities required to achieve store goals including unit sales performance, personnel management, customer service, merchandise presentation, loss prevention, expense control and

---

[1] The matters set forth herein are admitted as true for purposes of this motion only.

overall store administration." (Exhibit 12 to Deposition of Stephanie Wheeler (hereinafter "Wheeler Dep.") at 2.)

4. The standard workweek for a Zales Outlet store manager is 48 hours, including some weekend and evening hours. (Wheeler Dep. Exh. 12, at 2.) It is also expected that store managers will work two 12-hour shifts per week. (Wheeler Dep. at 37; Deposition of Jamie Marcil (hereinafter "Marcil Dep.") at 84-85.) Store manager salaries are based on a workweek of 48 hours. (Marcil Dep. at 163; Deposition of Vicki McGuire (hereinafter "McGuire Dep.") at 59.)

5. The business of retail jewelry sales is seasonal. The period between Thanksgiving and Christmas is the busiest time of the year. During this Christmas season, store managers were expected to work additional weekly hours, increasing up to approximately 70-80 in the week before Christmas. (Marcil Dep. at 56; Deposition of Plaintiff Susan Mount (hereinafter "Pl. Dep.") at 56-57.)

6. The first quarter of the calendar year is the slowest time of the year. Many retail locations, including the Lee Zales Outlet at which plaintiff was employed, operate so-called "winter hours" during this period. The winter hours for the Zales Outlet in Lee generally ran from January through March. During this time, the store hours were reduced. Instead of closing at 9:00 p.m. on Monday through Thursday, the Outlet closed at 6:00 p.m. And Sunday hours were reduced from 10:00 a.m. - 6:00 p.m. to 11:00 a.m. - 6:00 p.m. (Pl. Dep. at 46-47.)

7. At the time plaintiff commenced her employment in the Summer of 1999, Zales Outlets did not have a Regional Manager in the Northeast territory, which encompassed Massachusetts. Approximately one year into plaintiff's employment with Zale, Barry Gresky became the Regional Manager for Zales Outlets. Mr. Gresky remained plaintiff's direct superior

until Jamie Marcil took over the post of Regional Manager in or about February 2002. Marcil remained plaintiff's supervisor through the remainder of her employment with Zale. (Marcil Dep. at 14, 20, 21.)

8. With respect to business matters, Marcil reported to Vicki McGuire, then Vice-President of Store Operations for Zales Outlets, and to Stephanie Wheeler, then the Human Resources Manager, regarding personnel matters. (Marcil Dep. at 16.)

9. Every Zale Outlet store is given a sales plan by which its performance is measured. Criteria in the sales plan include retail sales, credit applications, service warranties, repair department, payroll, and staffing. (Marcil Dep. at 29.)

10. In the Fall of 2002 Marcil discussed with McGuire that the Lee Zales Outlet was not performing to sales plan. Marcil was concerned because the store was starting to show a negative trend of not achieving its sales plan. (Marcil Dep. at 28-29.)

11. On October 8, 2002, plaintiff's father passed away. Plaintiff's father had been a care-taker for her children, along with plaintiff's stepmother. Plaintiff was provided bereavement leave following the death of her father. (Pl. Dep. at 68, 83-84.)

12. In late October, Zales Outlet issued its manager of the year award. (Pl. Dep. at 72-74.) Plaintiff did not receive the award. She was dissatisfied with not having received the award and questioned Marcil and McGuire about why she did not receive the award. (Pl. Dep. at 73, 77; Marcil Dep. at 104-05; McGuire Dep. at 16-17.)

13. CONFIDENTIAL - FILED UNDER SEAL

14. CONFIDENTIAL - FILED UNDER SEAL

15. CONFIDENTIAL - FILED UNDER SEAL

16. On or about April 7, 2003, plaintiff met Marcil for lunch and informed him that she intended to seek FMLA leave. Marcil appeared relieved that plaintiff was taking leave rather than resigning. Marcil indicated no objection or annoyance to plaintiff's intent to take FMLA leave. (Pl. Dep. at 117-18.)

17. Marcil was not aware that plaintiff was taking FMLA leave due to depression. He understood that her leave was being taken for childcare reasons. Marcil understood that plaintiff was having difficulty with childcare issues because her father, who had recently passed away, had been a care-taker for plaintiff's children. (Marcil Dep. at 143-44.)

18. CONFIDENTIAL - FILED UNDER SEAL

19. On April 17, 2003, Elston-Ferry completed the FMLA Certificate of Health Care Provider form, indicating that plaintiff would be unable to work due to her condition for approximately six to eight weeks. (Elston-Ferry Dep. 27-28; Elston-Ferry Dep. Exh. 3.)

20. The following day, April 18, 2003, plaintiff submitted to Zale a Leave of Absence Application, requesting full-time leave due to her own serious health condition commencing April 19, 2003, along with the Certificate of Health Care Provider form completed by Elston-Ferry.

21. On that day, April 18, 2003, the last day before the commencement of her leave, plaintiff worked a 10 ½ hour shift. (Declaration of Jamie Marcil (hereinafter "Marcil Decl.") ¶ 4; Marcil Decl. Exh. 1.)

22. On April 21, 2003, by its Response to plaintiff's Request For Leave of Absence, Zale informed plaintiff that her request for FMLA leave had been approved, and that her leave would be from April 19, 2003 continuing until on or about June 22, 2003. (Wheeler Dep. Exh. Exh. 24.)

23. The period of leave granted to plaintiff by Zale - April 19, 2003 to June 22, 2003 (nine weeks) - exceeded the 6 to 8 weeks of incapacity contemplated by Elston-Ferry on the Certificate of Health Care Provider form submitted by plaintiff in support of her request for FMLA leave.

24. From April 19, 2003 through her date of separation from Zale (June 30, 2003) plaintiff did not obtain treatment with any therapist regarding her depression, despite the 12-session treatment plan agreed to on or about April 16, 2003. (Pl. Dep. at 135.)

25. Shortly prior to the expiration of her FMLA leave, plaintiff had a telephone conversation with Marcil regarding her return to work. Marcil agreed that the June 27, 2003 return-to-work date proposed by the plaintiff would be accommodating to the store's needs, and he directed the plaintiff to contact Human Resources to follow through with any applicable paperwork necessary to obtain additional leave. (Pl. Dep. at 144.)

26. Following her discussion with Marcil, plaintiff spoke by telephone on June 20, 2003, with Janet Wells, a Zale leave of absence coordinator, about extending her leave. (Pl. Dep. at 144.)

27. Subsequent to their June 20, 2003 discussion, Wells sent plaintiff a letter dated June 23, 2003, confirming that plaintiff's designated FMLA leave had expired on June 22, 2003, but that she had been granted a personal leave allowing her additional time to return to work. (Pl. Dep. Exh. 9.)

28. Plaintiff understood from her discussions with Marcil and Wells that she was to return to work on June 27, 2003. (Pl. Dep. at 145-46.)

29. Zale's FMLA policy provides that if an employee is unable to return to work at the conclusion of her FMLA leave, an extension may be requested under the personal leave of

5

absence policy. The personal leave of absence policy does not, however, provide guaranteed job protection. If the employee does not return to work following the conclusion of approved leave, Zale considers the employee to have voluntarily resigned. (Wheeler Dep. Exh. 21.)

30. In anticipation of her return to work, on or about June 19, 2003 plaintiff provided to the interim acting store manager of the Lee Zales Outlet plaintiff's schedule for her first week back to work as store manager. (Pl. Dep. at 142-144.) Plaintiff scheduled herself for a 39.5 hour workweek. (Pl. Dep. at 147; Pl. Dep. Exh. 10.)

31. When Marcil received the schedule, he contacted the plaintiff on June 26, 2003 to discuss the fact that she did not schedule herself to work the 48 hour schedule or the two 12-hour shifts expected of a store manager. (Pl. Dep. at 146.)

32. Plaintiff testified that she submitted the 39.5 hour schedule "[b]ecause it was typical of the schedules that [she] had been working prior." (Pl. Dep. at 147.)

33. The actual schedules reveal that in the six month period prior to going out on FMLA leave plaintiff had averaged approximately 44 hours per week. (Declaration of Paula Gordon (hereinafter "Gordon Decl.") ¶ 7.) For the one-year period prior to taking leave, plaintiff averaged approximately 42.5 hours per week. (Gordon Decl. ¶ 8.)

34. Marcil informed plaintiff that upon return to work she would be required to work the 48 hour manager's schedule with two 12-hour shifts. (Pl. Dep. at 147-48; Marcil Dep. at 161.)

35. Plaintiff told Marcil that because of family issues, she could not adhere to the standard manager's schedule of 48 hour workweeks with two 12-hour shifts. (Marcil Dep. at 162 and Exh. 43; Pl. Dep. at 148.)

36. Plaintiff said "something in the manner of that she was still experiencing some of the childcare concerns that she had previous to her leave and, therefore, she would not be able to work certain shifts." (Marcil Dep. at 162.)

37. Plaintiff testified that she told Marcil, "given my situation and family needs after medical leave, I don't know how I can adhere to that [standard manager's schedule]." (Pl. Dep. at 148.)

38. Marcil offered to allow plaintiff to alter the days on which she would be required to work the 12 hour shifts in order to accommodate her husband's work schedule and her family's childcare issues. Plaintiff declined. (Marcil Dep. at 173; Pl. Dep. at 158-59.)

39. Plaintiff did not tell Marcil that she could not comply with the manager's schedule because of depression, and did not request of Marcil that her schedule be modified as an accommodation for depression. (Marcil Dep. Exh. 43.)

40. Subsequent to her discussion with Marcil, plaintiff did not contact Human Resources Manager Wheeler, or any member of Zale management above Marcil to advise them that she was unable to work the standard manager's schedule due to depression, or to request a modified schedule as an accommodation for her depression.

41. Following Marcil's June 26, 2003 telephone conversation with plaintiff, he spoke with Wheeler about plaintiff's refusal to work the standard manager's schedule. (Wheeler Dep. at 19; Marcil Dep. at 164.)

42. Wheeler prepared a letter, which was sent to plaintiff by Federal Express. The letter explained to plaintiff that she was required to work the 48 hour schedule expected of managers and that if she did not return to work by June 30, 2003 ready to work the required shift, Zale would consider her to have voluntarily resigned her position. (Wheeler Dep. Exh. 27.)

7

43. Wheeler also wrote in her letter of June 26, 2003 to plaintiff: "If you have circumstances that should be taken into consideration, please let me know before Monday, June 30, 2003. If you have any questions, you may contact Mr. Marcil or me [ ]. Please give this matter your urgent attention." (Wheeler Dep. Exh. 27.)

44. CONFIDENTIAL - FILED UNDER SEAL

45. CONFIDENTIAL - FILED UNDER SEAL

46. Plaintiff did not provide this note to Zale, but instead sought legal representation. (Pl. Dep. at 152-53.)

47. Plaintiff failed to report to work on June 30, 2003. Marcil reported this to Wheeler, who in turn spoke with McGuire. (Wheeler Dep. at 21-22.) Because plaintiff had not returned to work, she was considered to have voluntarily resigned her position, and termination paperwork was prepared. (Wheeler Dep. at 22-23.)

48. Plaintiff testified that she received Wheeler's June 26, 2003 letter on July 1, 2003. (Pl. Dep. at 160.) Upon receiving the letter, plaintiff made no attempt to contact Wheeler to explain her circumstances, her need for additional leave, or to try to resolve the situation (Pl. Dep. at 160.) By the time plaintiff received Wheeler's letter, she had already conferred with legal counsel regarding her employment. (Pl. Dep. at 153-54.)

49. The Personnel Action Form concerning plaintiff's separation from Zale reflects that plaintiff's separation was a "Voluntary Resignation." (Wheeler Dep. Exh. 28.) The comments section of the form states that plaintiff "refused to work manager's schedule and quit." (Id.)

50. Following plaintiff's separation, Gaynor Till took over as acting store manager on a temporary basis. Till held this position on a temporary acting basis and did not receive the

store manager's salary and was not eligible for bonuses as actual store managers were. Because she was holding the position on a temporary basis and did not assume all store manager responsibilities, Till was not expected to work 48 hours per week. (Marcil Dep. at 74-77; McGuire Dep. at 51.)

51. Approximately a month after plaintiff's termination Deanna Laffan was appointed the new store manager of the Lee Zales Outlet. (Marcil Dep. at 72.)

52. In the six month period subsequent to her appointment, Laffan worked an average of approximately 53 hours per week. In the one-year period following her replacement of plaintiff, Laffan worked an average of approximately 51 hours per week. (Gordon Decl. at ¶¶ 9, 10.)

Respectfully submitted,

ZALE DELAWARE, INC.,

By its attorneys,
HOLLAND & KNIGHT LLP

/s/ Neal J. McNamara
Neal J. McNamara (BBO #556329)
Robert J. Crohan Jr. (BBO #652965)
One Financial Plaza – Suite 1800
Providence, RI 02903
Tel. (401) 751-8500
Fax. (401) 553-6850

<u>CERTIFICATE OF SERVICE</u>

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 31, 2006.

                                                <u>/s/ Marilyn Lovely</u>

\# 3545037_v2