**JAMIE LEE MARCIL**
**October 24, 2005**

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No.: 3:04-CV-30152-MAP

*********************

SUSAN MOUNT,            *

  Plaintiff              *

  vs.                    *

ZALE DELAWARE, INC.,    *

  Defendant              *

*********************

DEPOSITION OF: JAMIE LEE MARCIL

CATUOGNO COURT REPORTING SERVICES

1414 Main Street

Springfield, Massachusetts

October 24, 2005   9:30 a.m.

Kristen M. Edwards

Court Reporter

JAMIE LEE MARCIL
October 24, 2005

Page 14

1  A.  Yes. I believe it would have been
2  in '95.
3  Q.  And then where did you go?
4  A.  Then in October of '97, I believe I
5  returned to Zale Corporation as a store manager in
6  one of their Worcester locations. And in April of
7  '99, still with Zale Corporation, transferred to
8  the Zale Outlet division to open their Wrentham
9  location.
10 Q.  That was in '99 you said?
11 A.  That was in '99 that I made the
12 transfer still with Zale Corporation but made the
13 transfer between divisions.
14 Q.  Did you work in '99 out of the
15 Wrentham location?
16 A.  I did.
17 Q.  For how long did you do that?
18 A.  Until February of '02, I believe
19 when I took the regional manager position in the
20 New England territory still for Zale Outlet.
21 Q.  Where did you physically work out of
22 starting in February of '02 as the regional
23 manager?
24 A.  Wrentham was considered my base

Page 15

1  store, my office store. That is where my mail
2  would be delivered, but I worked out of all
3  locations in the northeast.
4  Q.  How often would you move around to
5  different locations?
6  A.  It depended on the given situation,
7  requirements by store. But I would say on
8  average, I'd see a store once every two to three
9  months for a day or two.
10 Q.  If you had to average the amount of
11 time you spent in Wrentham giving approximations
12 here --
13 A.  Every Monday.
14 Q.  Every Monday you would be located at
15 the Wrentham store?
16 A.  Correct.
17 Q.  Does that mean that every other day
18 of the week Tuesday through Friday you would be
19 somewhere else?
20 A.  Most often, yes.
21 Q.  How many days on average would you
22 spend at another location; would it be two days,
23 one day?
24 A.  It would typically be a one or two

Page 16

1  day visit depending on the location.
2  Q.  Where was HR located; when you had
3  to deal with HR at Zale, where were they located?
4  A.  Irving, Texas is the home office.
5  Q.  As a regional manager, who did you
6  deal with at HR?
7  A.  At that time Stephanie Wheeler.
8  Q.  Did you ever speak to anyone else at
9  HR other than Stephanie Wheeler about issues,
10 management issues?
11 A.  Occasionally you would speak to
12 other people in HR, but Stephanie was specifically
13 designated as our human resources contact.
14 Q.  What kinds of things would you talk
15 to her about?
16 A.  Anything from I mean employment
17 issues to, you know, benefit issues, payroll
18 issues. Really anything and everything.
19 Q.  Did you have a supervisor when you
20 were regional manager?
21 A.  Um-hmm. Vicki McGuire was the vice
22 president of Zale Outlet.
23 Q.  Where was her office located at?
24 A.  Also Irving, Texas at the home

Page 17

1  office.
2  Q.  Did you have occasion to speak to
3  her?
4  A.  Yes.
5  Q.  For what reasons would you speak to
6  her?
7  A.  Any reasons involving any operation
8  for business, any and all. She was my direct
9  supervisor.
10 Q.  Did you ever speak to her about
11 Susan Mount?
12 A.  Yes.
13 Q.  What conversations did you have with
14 her about Susan Mount?
15 A.  Performance of the store,
16 performance of Susan as an individual, staffing.
17 Anything related to the Lee location.
18 Q.  So the two people that you spoke to
19 in management at your level or above were Vicki
20 McGuire or Stephanie Wheeler?
21 A.  In most instances, yes.
22 Q.  Did you speak with anyone at Zale
23 Corporation other than those two about the
24 plaintiff in this case Susan Mount?

**JAMIE LEE MARCIL**
October 24, 2005

Page 18

1     A.    Not that I recall. I mean, I am
2 sure that I did. She was with the company for a
3 long time. I am sure that -- I am not sure on
4 what context you mean the question. I mean, I
5 have spoken to buyers about specific requests that
6 Susan may have for herself or her store. I've
7 spoken to marketing about events that she may have
8 been running. I've spoken to Nancy Skinner, our
9 president, again, about merchandising needs.
10     Q.    I am speaking about management
11 issues.
12     A.    Typically about management issues,
13 no. It would be Stephanie Wheeler or Vicki
14 McGuire.
15     Q.    So how long did you hold the
16 regional manager position in Wrentham for Zale?
17     A.    Until September 1st of '05.
18     Q.    Then where did you go?
19     A.    I am currently employed with Ultra
20 Diamonds.
21     Q.    Where are they located?
22     A.    Their home office is in Chicago,
23 Illinois.
24     Q.    Where do you work?

Page 19

1     A.    I work at the Boston location.
2     Q.    What is the address there?
3     A.    285 Washington Street, Boston,
4 Massachusetts.
5     Q.    What is your current position there?
6     A.    Store manager.
7     Q.    So have you outlined for me pretty
8 much your complete work history giving approximate
9 dates?
10     A.    I believe so since high school, yes.
11     Q.    Did you ever receive any type of
12 warning or reprimand at any job?
13     A.    No. I am not sure what you mean by
14 warning or reprimand. I mean, I received early on
15 in my career notice that my sales were not up to
16 par for their expectation.
17     Q.    Where was that?
18     A.    That was at Zale in '94. And then
19 in this past summer, I don't know that I would
20 consider it a warning or reprimand but, again, a
21 discussion regarding the territory's performance.
22     Q.    At Zale?
23     A.    At Zale, um-hmm.
24     Q.    Who talked to you about the

Page 20

1 performance?
2     A.    At that time it was Michael Fox.
3     Q.    Who is Michael Fox?
4     A.    He is the director of stores. It is
5 a position that is typically between regional
6 manager and vice president. However, at the time
7 of Susan's employment, we did not have that
8 position.
9     Q.    At the time that Susan Mount was
10 employed at Zale Corporation, can you give me the
11 basic higher archy?
12     A.    From the store manager level?
13     Q.    Yes.
14     A.    It would be store manager, regional
15 manager. And then we would report at that time
16 directly to the vice president of operations.
17     Q.    And were you Susan Mount's regional
18 manager the entire time that you were employed?
19     A.    I was not, no. She began with Barry
20 Gresky. Actually, she began prior to Barry coming
21 on. When Susan first began as store manager, we
22 did not have any regional managers in the
23 territory. Zale Outlets were still new, and there
24 were not enough stores. We were being assisted by

Page 21

1 but not directly managed by a Zale regional
2 manager.
3     Q.    Who was that?
4     A.    Don Gifford.
5     Q.    Do you remember over what time
6 period Don Gifford was in that role?
7     A.    Probably less than the first year,
8 six months maybe, possibly a year. I don't recall
9 exactly. I know it was a short time in the very
10 beginning.
11     Q.    Then there was a regional manager
12 after him by the name of?
13     A.    Barry Gresky.
14     Q.    Do you remember over what time
15 period he was the regional manager?
16     A.    For about two years. So, I mean, I
17 would have to say '99, probably summer of 2000,
18 June of 2000 until January of 2002, a year and a
19 half maybe.
20     Q.    At which point you came on as the
21 regional manager?
22     A.    Correct.
23     Q.    Have you told me all the ways in
24 which you think you were either reprimanded or

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI

JAMIE LEE MARCIL
October 24, 2005

Page 26

1  A.  Human resources.
2  Q.  Who in human resources?
3  A.  I would assume Stephanie Wheeler.
4  Q.  Do you know what was discussed with
5  respect to Susan Mount's termination of
6  employment?
7  A.  Performance, attitude and
8  specifically work schedule.
9  Q.  How do you know those three areas
10 were discussed?
11 A.  Because they were part of an ongoing
12 discussion prior to any termination.
13 Q.  Were you part of those discussions?
14 A.  At times, yes. Not of all
15 discussions. I would say that I was not
16 necessarily part of any discussion between Vicki
17 and Stephanie. But at times I would have
18 different discussions with each of them
19 individually.
20 Q.  Did you discuss those three subject
21 areas?
22 A.  Yes. I mean, I don't recall
23 specifics, but those are subject areas that we
24 discussed almost on any store.

Page 27

1  Q.  As a matter of routine?
2  A.  Yes.
3  Q.  Do you remember though what you
4  discussed about Susan Mount concerning those three
5  areas or no?
6  A.  The fall prior to Susan leaving, I
7  would have discussed with Vicki performance and
8  attitude. And then just before her return from
9  leave in the spring, I would have discussed with
10 Stephanie work schedule.
11 Q.  I am asking you what you did. First
12 of all, I am asking what you did discuss or what
13 you recall discussing?
14 A.  That is what I recall discussing.
15 Q.  So prior to Susan leaving on --
16 Susan Mount leaving on FMLA leave, you discussed
17 performance issues with Vicki McGuire; is that
18 what you are saying?
19 A.  Yes.
20    MR. MCNAMARA: Objection. That is
21    not what he said. The time frame was off.
22 A.  It was the fall prior to her
23 leaving. It was probably -- I don't recall when
24 Susan left specifically. It was May or June or

Page 28

1  July. It was the fall prior. It would have been
2  the September, October, November prior.
3  Q.  (By Mr. Shea) Of what year?
4  A.  Of -- I don't -- I am sorry. I
5  don't have the dates. The June or July that Susan
6  left -- I am sorry. I don't have the dates. What
7  year was that? Would you be able to help me with
8  that?
9  Q.  Let's just leave that for now. What
10 was discussed; do you recall?
11 A.  With Vicki McGuire it would have
12 been store performance.
13 Q.  What did you discuss?
14 A.  That the store was not performing to
15 sales plan.
16 Q.  Can you be more specific?
17 A.  I can't. I mean, I just don't
18 recall to be more specific.
19 Q.  How many conversations did you have
20 with Vicki McGuire at that point?
21 A.  I don't recall a specific number of
22 conversations. It was an ongoing regular routine.
23 Almost every context that I would have with Vicki,
24 we would discuss numerous store's performance and

Page 29

1  direction.
2  Q.  Was Susan Mount's store at that time
3  a concern of yours in terms of was it terribly
4  underperforming in your view?
5     MR. MCNAMARA: Objection. You can
6     answer the question still.
7  A.  It was beginning to be, yes.
8  Q.  (By Mr. Shea) How was that; why do
9  you believe that to be so?
10 A.  It was starting to show a negative
11 trend of not achieving sales plan.
12 Q.  You were talking to Vicki McGuire
13 about that at that time?
14 A.  Yes.
15 Q.  How did you measure the store's
16 performance at that time?
17 A.  Versus every store is given a sales
18 plan that we would measure it versus whether or
19 not the store achieves store plan and other
20 business criteria, credit applications, service
21 warranties, repair department, payroll, staffing.
22 Q.  And then so you had -- you know you
23 had at least one conversation with Vicki McGuire
24 about Susan Mount's performance?

8 (Pages 26 to 29)

Page 54

1  closed early during those months at working the
2  longer hours we would typically work on a Monday
3  or a Friday. Typically, we would be there from
4  nine to nine on those days. And if the mall
5  closes at six on those days, then a manager wasn't
6  able to be there nine to nine.
7      Q.  What conversations did you have with
8  Susan Mount about this 48 hour requirement? Let's
9  start with the first one that you recall. When
10 and what was said and who was present?
11     A.  The first one that I recall would
12 have been --
13     Q.  Not would have been. When is the
14 first one that you recall?
15     A.  November of the year prior.
16 November of '02, I guess that would be.
17     Q.  Who was present and what was said?
18     A.  I think only Susan and I. It would
19 have just been addressing the required manager's
20 schedule for the Christmas season.
21     Q.  I don't want speculation. I am
22 asking if you recall a conversation what was said?
23     A.  The conversation I recall was
24 explaining to Susan what the manager's requirement

Page 55

1  schedule would be for the Christmas season the
2  weeks between Thanksgiving and Christmas. The
3  reason I specifically had the conversation with
4  Susan was because she did not attend our Christmas
5  meeting where it was addressed with the rest of
6  the management group so I discussed it with her
7  individually that this would be the manager's work
8  schedule for the Christmas season.
9      Q.  So the 48 hour rule applied for the
10 Christmas season?
11     A.  In fact, it was more than 48 hours.
12     Q.  So did you talk to her about working
13 more than 48 hours?
14     A.  I gave her a booklet that said in
15 this booklet is the required manager's schedule
16 for the Christmas season. I did not decide the
17 schedule. That schedule was handed to me by my
18 direct management.
19     Q.  Just so we are clear, the 48 hour
20 requirement that you were referring to, did that
21 apply year-round or just during the Christmas
22 season?
23     A.  Year-round. During the Christmas
24 season, they increased the number of hours that we

Page 56

1  were expected to work. Our salary is still only
2  based on the 48.
3      Q.  Was that policy in writing?
4      A.  I am not sure if it was in writing.
5  It was understood that that is what they did. I
6  can't say whether or not it was in writing that if
7  you would take this position with us your hours
8  will increase at Christmas.
9      Q.  From 48 hours to what?
10     A.  What did it increase to?
11     Q.  Yes.
12     A.  It was a gradual increase. As you
13 got closer to Christmas, I want to say something
14 closer to maybe 70 hours a week for the final week
15 or perhaps more.
16     Q.  You are not sure?
17     A.  I am not positive.
18     Q.  So is it fair to say that all of the
19 managers at all of the locations that you
20 supervised followed this policy except for Susan
21 Mount?
22        MR. MCNAMARA:  Objection.
23     A.  I didn't say that I felt that Susan
24 didn't follow that policy during that Christmas

Page 57

1  season.
2      Q.  (By Mr. Shea) Well, you've talked
3  about the 48 hour rule, correct?
4      A.  We talked about the requirement for
5  the schedule for the Christmas season and not
6  specifically the 48 hour rule. Because the
7  required schedule for the Christmas season would
8  have been in excess of the 48 hour rule anyway.
9      Q.  Let's back up to the first
10 conversation again, and then let's take it from
11 there.
12     A.  Okay.
13     Q.  In November of '02, you said you had
14 a conversation with her?
15     A.  Um-hmm.
16     Q.  Can you tell me what you said to
17 her?
18     A.  I can't say specifically. I believe
19 I would have informed her of the information she
20 missed at the weeks prior manager's meeting.
21     Q.  But you are not sure?
22     A.  I am not 100 percent positive of the
23 specifics of the conversation.
24     Q.  And generally the conversation, do

**JAMIE LEE MARCIL**
October 24, 2005

### Page 70

1  of hours the managers worked?
2      A.   It was my job responsibility. I
3  don't know whether or not it was only my job
4  responsibility.
5      Q.   Did you do that?
6      A.   As best I could when available, yes.
7      Q.   How would you monitor whether a
8  manager actually worked a number of hours they
9  were supposed to?
10     A.   I was limited in the ways. Really I
11 could only look at the schedule when I had time to
12 make sure that they were scheduled for the
13 appropriate number of hours. Occasionally I would
14 make phone calls during a manager's scheduled work
15 time to see whether or not they were actually
16 there.
17     Q.   And that was the only way in which
18 you checked?
19     A.   That was the only way in which we
20 had available to check, yes. Managers did not
21 have a time clock or punch in or punch out.
22     Q.   And is it also fair to say that up
23 until the time that Ms. Susan Mount took her leave
24 that she was working a 48 hour schedule?

### Page 71

1          MR. MCNAMARA: Objection.
2      A.   I can't recall. I can't say.
3      Q.   (By Mr. Shea) And Gaynor Till, do
4  you know that name?
5      A.   Yes, I do.
6      Q.   Do you know who took over Susan
7  Mount's job responsibilities when she was on
8  leave?
9      A.   Initially no one did. And then
10 Gaynor after about a month, I believe Gaynor was
11 put into the place of temporary acting manager.
12     Q.   For Susan Mount?
13     A.   For the store. For the Lee
14 location.
15     Q.   And how long did she hold that
16 position?
17     A.   Gaynor was in that position for
18 approximately two months.
19     Q.   Did someone take over Susan Mount's
20 position after she was not able to return from
21 leave or did not return from leave because she was
22 terminated?
23     A.   Eventually, yes, there was another
24 manager put in place.

### Page 72

1      Q.   Who was that?
2      A.   Deanna Laffan.
3      Q.   Can you spell that last name?
4      A.   L-A-F-F-A-N.
5      Q.   How long did she hold that position?
6      A.   Approximately one year.
7      Q.   Did someone take her place?
8      A.   Yes.
9      Q.   Who was that?
10     A.   Gaynor Till.
11     Q.   Over what time period was Deanna
12 Laffan in Susan Mount's position?
13     A.   For approximately a year after she
14 left, so July until the following July.
15     Q.   Of what year?
16     A.   I don't -- '05, so '03 to '04.
17     Q.   And then Gaynor Till stepped into
18 that position?
19     A.   Correct.
20     Q.   For how long?
21     A.   Again, approximately a year from
22 July of '04 to through July of '05.
23     Q.   Then who stepped into that position?
24     A.   The current manager Diane Adamson.

### Page 73

1      Q.   Were you involved in Susan Mount
2  requesting FMLA leave?
3      A.   She informed me that she was going
4  to be requesting FMLA leave.
5      Q.   So the answer is yes?
6      A.   Yes.
7      Q.   What did you do when she requested
8  that?
9      A.   I directed her to contact human
10 resources, who handles the requirements for FMLA
11 leave.
12     Q.   Who did she talk to; do you know?
13     A.   I don't know. I would assume
14 Stephanie Wheeler, but I don't know specifically.
15     Q.   And when she went out on leave, you
16 put someone in her place?
17     A.   Not initially, no.
18     Q.   Not initially. Who was handling her
19 job responsibilities when she went out on leave?
20     A.   No one.
21     Q.   So you didn't have a manager at that
22 store?
23     A.   For about a month, we did not have
24 anyone as a manager or acting manager.

**Page 74**

1  Q. Why not?
2  A. The store's request was that they
3  could handle it on their own so we gave them the
4  opportunity to try.
5  Q. Who would handle the normal
6  manager's responsibilities?
7  A. Each person would do a little of
8  something. It was really no normal manager's
9  responsibility other than making schedule, closing
10 payroll. There were other people in the store who
11 would occasionally do those duties prior to Susan
12 leaving so they continued doing them while she was
13 out.
14 Q. Do you know who handled those job
15 responsibilities?
16 A. Gaynor Till was one. I don't recall
17 specifically who else in the store they had.
18 Q. And what were their requirements in
19 terms of the number of hours they had to work a
20 week, Gaynor Till at this time period and the
21 other employees who you don't recall; was it 48
22 hours a week?
23 A. No. It was 40 hours a week. A
24 temporary acting does not hold the same

**Page 75**

1  requirements as the 48 hour. They are typically
2  paid on a lower salary basis than what the actual
3  store manager is.
4  Q. Other than closing payroll and
5  making schedules, are there any other job
6  responsibilities of a store manager?
7  A. Overseeing the production of the
8  store, making sales plan. I mean, there are
9  shipments and other inventory related things but
10 they are not necessarily a manager only
11 responsibility. In most stores there are multiple
12 people that handle those tasks.
13 Q. Did Susan Mount handle these job
14 responsibilities as well?
15 A. Yes.
16 Q. Is there any difference between what
17 an acting store manager does and a regular store
18 manager?
19 A. Yes.
20 Q. What is that?
21 A. An acting store manager really just
22 maintains the store until the manager can come
23 back. They do the least and most limited amount
24 just to keep the store operating and functional.

**Page 76**

1  Q. What do you mean the least and most
2  limited?
3  A. You know, just really making sure
4  the store opens and closes on time and we do our
5  best to achieve sales.
6  Q. But isn't it true they are held to
7  the same standards, an acting store manager and a
8  store manager?
9  MR. MCNAMARA: Objection.
10 A. No.
11 Q. (By Mr. Shea) Are they held to any
12 standards other than making sure the door is
13 unlocked and then locked again at the end of the
14 day?
15 A. Not really, no.
16 Q. Is that in the Zale policy somewhere
17 that the acting manager doesn't have to meet any
18 standards?
19 A. Not that I am aware of.
20 Q. Where do you get that from?
21 A. The requirements of an acting store
22 manager?
23 Q. Yes.
24 A. I don't know where I got it from.

**Page 77**

1  Q. Did Gaynor Till work a store manager
2  schedule when she was the acting store manager?
3  A. No, it was not a requirement.
4  Q. Why not?
5  A. She was not eligible for bonuses.
6  She did not make the same amount of salary as the
7  store manager would make.
8  Q. Did you have any contact with Susan
9  Mount when she was on leave?
10 A. I don't believe I did, no.
11 Q. So you never had any telephone
12 conversation with her while she was on leave?
13 A. Not that I recall. I don't believe
14 so, no.
15 Q. Did she ever call you and/or you
16 call her and you discussed her leave of absence
17 after she went out on leave?
18 A. Not that I recall, no.
19 Q. Did she ever ask you for an
20 extension of her leave on June 20, 2003?
21 A. No, not that I recall.
22 Q. Did she ever ask you for an
23 extension of her leave on June 26, 2003?
24 A. Again, no, not that I recall.

20 (Pages 74 to 77)

JAMIE LEE MARCIL
October 24, 2005

Page 82

1  said?
2  A.  Yes.
3  Q.  Did you ask her what the health care
4  reasons were?
5  A.  No.
6  Q.  Sitting here today do you know what
7  the health care reasons were?
8  A.  I know of a conversation that I have
9  heard from a third party, but I don't know of
10 anything specific.
11 Q.  What did you hear?
12 A.  I have heard that Susan was also
13 seeing the same therapist with her son.
14 Q.  Who told you that?
15 A.  I don't recall.  Specifically
16 conversation I overheard from being in the Lee
17 location.
18 Q.  Well, was it an employee?
19 A.  I don't know.  I can't say that it
20 was directed at me as much as it was a
21 conversation I overheard in the store.  It would
22 have been store employees, yes.
23 Q.  You're clear that Susan Mount did
24 not have any disciplinary action taken against her

Page 83

1  at Zale while she was employed there, correct?
2  A.  I am not clear, no.
3  Q.  You don't know?
4  A.  I don't recall.  I am not 100
5  percent.  I don't recall doing any myself.  I may
6  have, but I don't recall doing any myself.
7  Q.  And the schedule that you said came
8  out is predetermined schedules in November of '02?
9  A.  Um-hmm.
10 Q.  Yes?
11 A.  Yes.
12 Q.  Did the store manager follow those
13 schedules; do you know or you don't know?
14 A.  To the best of my recollection, I
15 don't recall.  I don't recall having any
16 conversations or issues with the manager regarding
17 that schedule.
18 Q.  Did you have any issues with Susan
19 Mount following those schedules?
20 A.  No.
21 Q.  Do you know whether she worked more
22 than 48 hours a week during the Christmas season
23 of '02?
24 A.  I don't know specifically.  I assume

Page 84

1  that she did.
2  Q.  With respect to any other managers,
3  do you know whether they worked a minimum of 48
4  hours during the Christmas season of '02 or no?
5  A.  Again, I don't know specifically.  I
6  would assume that they did also.
7  Q.  Just so I am clear, you are not sure
8  about the number of hours that a manager would
9  have to work in the Christmas season above 48
10 hours?
11 A.  I know an increased gradual as we
12 got close to Christmas.  To say specifically from
13 week to week how many hours it would be, no, I
14 don't recall.
15 Q.  How was the 48 hours to be divided
16 up for manager's schedules?
17 A.  In the Christmas season?
18 Q.  In general.
19 A.  In general there was the expectation
20 of two doubles a week typically recommended on
21 Monday and Friday and then three eight hour
22 shifts.
23 Q.  The two doubles a week, was that
24 mandated or was that just a recommended goal?

Page 85

1  A.  That was the, I guess known desired
2  schedule but it was not mandated.  In fact, there
3  were managers that I allowed to work a double on
4  Saturday instead of Friday if their business
5  and/or scheduling needed to determine that was
6  better.
7  Q.  Was there a policy that stated that
8  working 48 hours per work and two 12 hour shifts
9  was the requirement of store managers?
10 A.  To say it was a policy there where
11 we could refer to the policy book, I am not 100
12 percent certain.  I know it's a discussion during
13 the interview process, but I did not hire Susan so
14 I am not sure of the discussion.
15 Q.  Do you know what a mock schedule is?
16 A.  No.  A draft schedule, a mock
17 schedule I would assume is a draft or an outline
18 of a recommended schedule.  But I don't know
19 specifically by that term, no.
20 Q.  Was there a term used for schedules
21 that were proposed but not necessarily followed?
22 You just used the word "draft."  Were there draft
23 schedules?
24 A.  Each store had a guideline schedule

22 (Pages 82 to 85)

Page 102

1  another perfect Triple Zero inventory. On
2  July 19, 2002, store manager, Susan Mount, and her
3  staff have achieved a fifth perfect inventory
4  along with a fifth consecutive time in the 500
5  Club.
6      Q.  So according to me, is it fair to
7  say as of July 22, 2002 Zale appears to have
8  considered Ms. Mount to be, quote, very dedicated
9  to following the company's policies and procedures
10 to the letter, end quote; is that fair to say?
11     A.  As it applies to the inventory, yes.
12     Q.  Please turn to Exhibit 6. Tell me
13 if you recognize that document?
14     A.  I don't recognize it, again,
15 specifically as I can recall having seen it
16 before. But it looks to be part of a newsletter.
17     Q.  What part of the company newsletter?
18     A.  This would be a separate newsletter.
19 This would be part of the fall kickoff meetings.
20 I guess this would be recognition for the prior
21 year.
22     Q.  And did Susan Mount's store have a
23 perfect inventory in her management?
24     A.  According to the previous letter she

Page 103

1  did, yes. This does not refer to that however.
2      Q.  Did you ever tell Susan Mount she
3  would make a great regional manager?
4      A.  Yes. I am sure I must have.
5      Q.  Why do you say that?
6      A.  Because I can't recall a specific
7  date. It was discussed certainly that she could
8  be progressing down that line if that is where she
9  desired to steer.
10     Q.  Did your opinion of that change at
11 any point in time?
12     A.  Toward the latter part as the
13 attention to the store and the store's performance
14 began to decline was a concern. But I still felt
15 as though she had the makings of achieving that
16 position.
17     Q.  When you say store's performance
18 began to decline, what do you mean?
19     A.  Was not achieving sales plan.
20     Q.  Was that the only thing you meant by
21 what you just said?
22     A.  Yes.
23     Q.  Can you take a look at Exhibit 7,
24 please?

Page 104

1      A.  (Witness complying)
2      Q.  Let me know when you are done
3  looking at it. I am going to ask you whether you
4  recognize it?
5      A.  I don't recognize the document. I
6  recognize what it is referring to.
7      Q.  Do you recognize the handwriting?
8      A.  I do not. It appears to be Susan.
9  It is signed Sue at the bottom.
10     Q.  What do you think it's referring to?
11     A.  This is referring to a manager of
12 the year award that coincides with performance for
13 the previous year.
14     Q.  Does it indicate anything else to
15 you?
16     A.  She is dissatisfied with the results
17 of who won manager of the year and is questioning
18 why she did not receive it.
19     Q.  Did you have any conversations with
20 her on this subject?
21     A.  I did.
22     Q.  What was those conversations?
23     A.  She originally questioned me as to
24 how she could not have won the award and how

Page 105

1  another store did. I informed her that I did not
2  have those specific results criteria. I then in
3  turn had a conversation with Vicki McGuire
4  regarding it, and I believe put Susan in touch
5  with Vicki so she could have direct conversation
6  regarding the results.
7      Q.  What do you mean by I didn't have
8  the specific results criteria in other stores?
9      A.  The manager of the year award is
10 based on other things other than just sales
11 performance. The sales performance is one of the
12 categories. The criteria that I also weigh other
13 categories such as credit applications, service
14 plans, you know, different business criteria. And
15 the categories are weighed as a different
16 percentage. I don't have those at my level.
17 Vicki McGuire had that information at her level.
18     Q.  Is she the one that weighed the
19 different categories in this instance?
20     A.  No, it's predetermined. I mean, the
21 categories are predetermined before the year
22 begins. That is how much this category will mean
23 to you in your overall score. So, I guess in
24 explanation or reference to this document Susan

**JAMIE LEE MARCIL**
October 24, 2005

Page 142

1  that?
2  A.  Yes.
3  Q.  Week ending 4/24/03?
4  A.  Yes.
5  Q.  Was Sue Mount scheduled to work 48
6  hours that week?
7  A.  No. I believe that this was the
8  week that she left for her leave.
9  Q.  So she was only scheduled to work
10 from 6:30 to five on April 18, 2003; is that
11 correct?
12 A.  Correct. The store had an
13 inventory.
14 Q.  And that is the week that Susan
15 Mount's leave began?
16 A.  Yes.
17 Q.  On 4/19/03, correct?
18 A.  I believe so, yes. I am not sure.
19 HR would have the specific documents.
20 Q.  So is that the week that Gaynor Till
21 began working as the acting store manager? You
22 said there was a gap there.
23 A.  No, it is not.
24 Q.  Over on the right-hand side of that

Page 143

1  document, do you see where it says week total?
2  A.  Yes.
3  Q.  Do you know what that refers to?
4  A.  It refers to the total number of
5  hours that the person listed would be scheduled.
6  Q.  Did you say sales associates were 40
7  hours a week employees?
8  A.  It depends. Up to 40. It depends
9  on the hiring agreement.
10 Q.  At this point in time on April 8th
11 -- I am sorry -- April 18, 2003, did you know --
12 A.  April 18th?
13 Q.  April 18, 2003 did you know why
14 Susan Mount was out on leave?
15 A.  From the previous document you mean?
16 Q.  I am just referring to the date in
17 general.
18 A.  On April 18th did I know why she was
19 taking her leave?
20 Q.  Yes.
21 A.  At that point it was communicated to
22 me that it was for childcare reasons.
23 Q.  Do you know what about childcare it
24 involved?

Page 144

1  A.  Susan was having difficulty with
2  making an adjustment to new childcare situation is
3  what it was communicated to me.
4  Q.  Was anything else communicated to
5  you?
6  A.  Her father was the primary care
7  physician for her children. Not primary care
8  physician, primary daycare. When he passed the
9  previous fall, she had had difficulty finding
10 regular childcare after that.
11 Q.  Did you know that she suffered
12 depression as a result of her father passing away?
13 A.  I knew that she was upset, as I
14 think anybody would and should be about the
15 passing of a parent.
16 Q.  Did you know she was depressed?
17 A.  I did not.
18 Q.  Did you ever learn that she became
19 depressed?
20 A.  Not directly, no.
21 Q.  Indirectly did you?
22 A.  Rumor that I overheard in the store
23 that I referred to previously that she was also
24 seeing a doctor along with one of her children.

Page 145

1  Q.  And do you know whether Susan was on
2  any medication for depression?
3  A.  I do not.
4  Q.  What about any of her children?
5  A.  I do not.
6  Q.  Do you know for how long she was
7  going to be out of work on April 18, 2003?
8  A.  I assume the 12 weeks allowed under
9  FMLA.
10 Q.  How many hours did Gaynor Till work
11 during that week? I am back to Exhibit 22. And
12 do you know how many hours a week --
13 A.  Exhibit 22?
14 Q.  Yes.
15 A.  Says here 33. No, I am sorry. Yes,
16 33.
17 Q.  What is the maximum number of hours
18 anyone worked during that week?
19 A.  40.
20 Q.  Who was scheduled to work 40 hours
21 that week?
22 A.  Rhonda.
23 Q.  Do you know Rhonda's last name?
24 A.  I do not.

37 (Pages 142 to 145)

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JAMIE LEE MARCIL**
**October 24, 2005**

### Page 158

1 This appears to be that, but I cannot say that
2 this is that specific document.
3   Q.  Before this document or before this
4 document was faxed to you, did you have any
5 conversations with Susan Mount about her return to
6 work?
7   A.  I may have. I don't recall.
8   Q.  Does it refresh your recollection
9 that you talked to Susan Mount in the first week
10 of June 2003; does that sound right?
11   A.  It's possible. I don't recall
12 specifically.
13   Q.  Do you recall whether Susan Mount
14 asked you at that point in time whether she could
15 return to work on the 27th of June 2003?
16   A.  I don't recall. She may have.
17   Q.  Do you recall whether in that
18 conversation or any other conversation you said no
19 problem and told her that she just needed to speak
20 with HR?
21   A.  I don't recall specifically, but it
22 does sound like if the conversation happened that
23 would be the direction.
24   Q.  So isn't it fair to say that you

### Page 159

1 were expecting Susan Mount to return to work on
2 June 27, 2003 and that is why she was faxing you
3 the schedule?
4   A.  I assume her by being listed on here
5 that that would be the date she would be
6 returning.
7   Q.  So the answer is yes?
8   A.  Yes.
9   Q.  And you said her name is on the
10 schedule?
11   A.  Yes.
12   Q.  And that schedule we are talking
13 about is Exhibit 32?
14   A.  Yes, 32.
15   Q.  Did you do anything in response to
16 receiving a copy of the schedule marked Exhibit
17 32?
18   A.  Again, I don't know that this is the
19 specific document that I received. But I know
20 when I received Susan's proposed schedule for her
21 returning to work, I noticed that it did not meet
22 the manager's requirements. I spoke to human
23 resources as to how to perceive it.
24   Q.  And what did you do or who did you

### Page 160

1 talk to?
2   A.  I talked to Stephanie Wheeler and
3 informed her this is the schedule that I received
4 so far. The response was that is not the
5 manager's schedule. She is going to have to work
6 the 48 hours that we pay her for. I don't recall
7 the specifics of how Susan was contacted about
8 that. I may have called and had that conversation
9 with her. I don't recall the specifics of how
10 that was conveyed to her.
11   Q.  So you may have called -- is it fair
12 to say that you may have called Susan Mount on
13 Wednesday, June 25, 2003 and left a message?
14   A.  Possible.
15   Q.  On her answering machine?
16   A.  Yes, that is possible.
17   Q.  Does it sound right?
18       MR. MCNAMARA: Objection.
19   A.  It would have been just before this
20 schedule so it's -- I have no reason to -- I can't
21 otherwise say that I definitely didn't. I am not
22 sure.
23   Q.  (By Mr. Shea) Do you remember
24 leaving a message on her machine about the

### Page 161

1 schedule?
2   A.  Not specifically, no. But I am not
3 saying that I didn't. I just don't recall
4 specifically whether how I contacted her.
5   Q.  What did you say to her when you
6 reached her?
7   A.  I mentioned --
8       MR. MCNAMARA: Objection.
9   A.  I mentioned to her that the schedule
10 was not of the requirement, and that we would have
11 to adjust it to get her to 48 hours.
12   Q.  (By Mr. Shea) Did you mention in
13 that conversation two 12 hour shifts per week?
14   A.  I may have. I don't recall.
15   Q.  Is it possible that you didn't
16 mention 48 hours in that conversation but you did
17 mention two 12 hour shifts per week?
18       MR. MCNAMARA: Objection.
19   A.  It's possible but I doubt it. I
20 believe I more than likely referenced the 48 hours
21 total.
22   Q.  (By Mr. Shea) What did Susan Mount
23 say to you in response to your conversation, your
24 calling her and expressing to her that her

JAMIE LEE MARCIL
October 24, 2005

Page 162

1 schedule needed to change?
2   A.  That she would not be able to.
3   Q.  What did she say?
4   A.  I don't recall the specific words.
5 I think something in the matter of that she was
6 still experiencing some of the childcare concerns
7 that she had previous to her leave and, therefore,
8 she would not be able to work certain shifts.
9   Q.  What did you say?
10  A.  That, you know, I had discussed this
11 with human resources and they informed me the
12 requirement of the position of a manager working
13 48 hours. If she was not able to do so, then we
14 would have to bring it further along with human
15 resources.
16  Q.  You said bring it further along?
17  A.  I don't know if I said those words,
18 no. But we would have to recontact human
19 resources and inform them that she wasn't able to
20 do the 48 hours.
21  Q.  And then what happened; what else
22 did you say in that conversation?
23  A.  That is all I recall. I don't
24 recall anything. I may have said something else.

Page 163

1 I don't recall specific what. I know it involved
2 the scheduling and the 48 hours.
3   Q.  How did you leave that conversation
4 and how did she leave it?
5   A.  She said to me, "So then you are
6 firing me?" I recall those words specifically. I
7 said, "No, I am not firing you. I am informing
8 you that we pay managers based on 48 hours, and
9 that is what we need you to work in order to
10 return as manager." And that is really the only
11 specifics from that conversation that I recall
12 partly because I felt as though that I wasn't
13 firing her and I didn't at that time know whether
14 or not she was going to be returning.
15  Q.  So up to this point in time, you had
16 called Stephanie Wheeler one time?
17  A.  No. I am sure I probably called --
18 I can't say I am sure. I don't recall. I assume
19 I would have spoken to her more than on one
20 occasion. I don't recall specific dates or
21 conversations with Stephanie.
22  Q.  How was this conversation left;
23 Susan Mount you said felt like you were firing
24 her?

Page 164

1   A.  That I would inform Stephanie
2 Wheeler at human resources of that conversation.
3 When I informed Stephanie, she said that she would
4 take over handling it. I believe she said that
5 they would send her a letter.
6   Q.  Did you have another conversation
7 with Susan Mount after that point in time?
8   A.  Not after that point. I don't
9 believe I did, no.
10  Q.  Did Stephanie Wheeler tell you what
11 they were going to do with respect to taking over
12 the situation?
13  A.  I think she said that they would
14 send her a letter and they would continue to
15 inform her of her responsibilities and duties.
16 And that they would take over the conversation
17 with Susan regarding it and that I was to wait to
18 hear back from Stephanie as to what to do with the
19 store moving forward.
20  Q.  Was Susan Mount ready to come back
21 to work in your view in the conversation you had
22 with her? Putting aside the issue that you are
23 talking about concerning hours, was she ready to
24 come back to work?

Page 165

1       MR. MCNAMARA: Objection.
2   A.  I don't know.
3   Q.  (By Mr. Shea)  Well, the plan was
4 she was coming back to work, right, her schedule
5 was in front of you?
6   A.  The plan was she was on the
7 schedule. Whether or not she was ready, I don't
8 know.
9   Q.  The only thing that stopped her from
10 coming back to work at that point in time was the
11 hourly issue you are referring to; is that
12 correct?
13      MR. MCNAMARA: Objection.
14  A.  I don't know. As far as I am aware
15 that is what stopped her, yes.
16  Q.  (By Mr. Shea)  Prior to looking at
17 the schedule marked as Exhibit 32, did you look at
18 any other schedules to see if she was working 48
19 hours a week?
20  A.  I did not.
21  Q.  Did you with respect to any other
22 managers at Zale Corporation?
23  A.  Refer to their schedule in reference
24 to what she should be working when she returned?

42 (Pages 162 to 165)

CATUOGNO COURT REPORTING SERVICES
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JAMIE LEE MARCIL**
**October 24, 2005**

Page 170

1  Mount, do you recall her asking why all of a
2  sudden do I need to work a different schedule?
3      A.  No, I do not.
4      Q.  Did you -- do you recall whether she
5  used any words to that effect or do you not?
6      A.  I don't recall the conversation.
7      Q.  Did you say to her that the two 12
8  hour day schedule was, quote, mandatory for all
9  managers, end quote, and that, quote, it is what
10 it is and what is in and is required, end quote;
11 do you recall that?
12     A.  No.
13     Q.  Do you recall saying words to that
14 effect?
15     A.  No.
16     Q.  You don't recall either way?
17     A.  I don't recall either way.
18     Q.  Other than what you testified to,
19 did Susan Mount say anything else in the
20 conversation?
21     A.  Not that I recall.
22     Q.  Did she say why now referring to why
23 is this schedule requirement being implemented now
24 or do you know?

Page 171

1      A.  I don't recall.
2      Q.  Did she say isn't there anything we
3  can do; do you recall that?
4      A.  No.
5      Q.  You don't recall either way?
6      A.  No.
7      Q.  Do you recall your replying no and
8  saying that all managers had to abide by that
9  schedule; do you recall that?
10     A.  I don't recall.
11     Q.  You don't recall either way?
12     A.  No, I don't.
13     Q.  Do you recall her saying so if I
14 can't work this schedule then I can't work in your
15 store, question mark, end quote; do you recall her
16 saying that?
17     A.  I don't recall.
18     Q.  Either way?
19     A.  No.
20     Q.  So it may have happened but you just
21 don't recall?
22     A.  Right.
23     Q.  Do you recall you responding, quote,
24 yes, you don't have a position, end quote; do you

Page 172

1  recall that?
2      A.  No, I don't recall that.
3      Q.  So you don't know whether you said
4  that either way?
5      A.  I do not believe I said that but I
6  don't recall either way, no.
7      Q.  And do you recall whether she then
8  said, quote, I don't think that is something I can
9  do given my family situation, end quote; do you
10 recall that?
11     A.  I believe that is in what I
12 referenced to where she was still having childcare
13 issues as to what was -- why her schedule was what
14 it was that she sent me.
15     Q.  So that she may have said that but
16 you are not sure?
17     A.  She may have said that. I don't
18 know those exact terms.
19     Q.  Do you know whether you responded,
20 quote, I expect your resignation to be faxed to me
21 tomorrow; do you recall saying that?
22     A.  I do not recall saying that. I
23 don't believe I would have said that.
24     Q.  You don't recall either way?

Page 173

1      A.  I don't recall either way.
2      Q.  Do you recall whether then she
3  replied I didn't resign and you are not getting my
4  resignation; do you recall that?
5      A.  No.
6      Q.  Do you know whether that was said?
7      A.  I don't recall.
8      Q.  So it may have been said but you
9  just don't recall?
10     A.  It may have. I don't recall.
11     Q.  Did you offer Susan Mount any
12 alternatives in this situation, any alternative
13 scheduling, any alternative options or changes to
14 the schedule from what you say you wanted it to be
15 at that point?
16     A.  I believe that I mentioned that if
17 she was not able to work the quote on quote model
18 schedule that as long as she got her hours in to
19 be a total of 48 then that would be acceptable.
20 Meaning, you know, she could work longer days on
21 the weekends perhaps when her husband was home and
22 available for childcare.
23     Q.  So do you recall talking and her
24 husband being mentioned in the conversation; do

44 (Pages 170 to 173)

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

*EXHIBIT 43*

To: Stephanie Wheeler – Human Resources
From: Jamie Marcil – RM Outlet NE
Re: Susan Mount
1/7/04

    Stephanie this letter is a description of details involving Susan Mount former mgr of Zales Outlet #2708 over the course of FY 03 beginning Aug 02, and her performance and factors leading to her separation in June 03.
    We began experiencing a downward trend in Susan's behavior and performance in Aug 02 after she was informed that she did not win the award for Manager of the Year for her volume group, she began demanding a detailed explanation from myself and VP Vicki McGiure. Both Vicki and myself had multiple conversations with Susan on the matter, she was never satisfied with the explanations she was given and started speaking very badly of the company, stating she was no longer happy with the job and didn't like the changes and direction she felt the Outlet division was going.
    Shortly after that she started requesting more time off than usual because she said her father was ill and he being the primary care person for her two children she needed the time for that and to be with her father. Unfortunately her father passed away in early Oct 02 and Susan was out for almost two weeks, upon returning to work her attitude and the stores performance continued to decline. Susan would often call and tell me she needed to leave early or change her schedule because she had no one to babysit. Then often she would just leave without notifying me and led me to believe she was keeping the required mgrs schedule of 48hrs per week with two open to close shifts as required by all store managers. After I realized this was happening so frequently I asked Susan about it and her response was she had no one she was happy with to watch her children so this is what she had to do, like it or not they come first.
    The schedule issue was at a lull for a while from Jan 03 thru March 03 because this mall changes to winter hours where the store closes at 6pm instead of 9pm. In April the hours return to 9pm closings, in March 03 Susan informed me that she would be taking a leave of absence for 12 weeks because of care for her children, at that time I referred her to the HR dept which handled the leave, she never mentioned to me anything about depression or mental leave. She began her leave on 4/18/03 and during my last conversation with her she told me she was no longer happy with her job or the stores performance and was ho◻ing this time out would rejuvenate her and she would be able to return as manger with the enjoyment she had previously. During her absence we had several employee issues in the store and the entire staff began to leave one at a time.
    I expected that everything was on schedule for Susan's return in late June 03. About a week before she was to return I received a schedule from the store that was her first week back but it only had her scheduled for 40 hrs and no time after 5pm. When I questioned her about it she stated that she still was having issues with child care and was only going to work a 40 hr work week with no doubles. I informed her that the 48hrs with 2 doubles was a required schedule for all mgrs, including her and that if the doubles couldn't be done on the regular Mon & Fri that I would make accommodation for her to do them on different days, perhaps Sat and another day that her husband was home to watch the children. She was still not excepting of this, I informed her that we had many other mgrs including single mother's that do the required schedule and the same was required from her. She stated she didn't care and she would only do 40 hrs with no doubles. After consulting with HR we informed Susan that if she did not return at the required work hours that she would not return as store manager, she said fine I guess I don't work there any longer.
    After Susan left the store she returned to pick up some personal belongings, at which time she made it a point to announce everyones payroll openly to the store so that all assoc would know how much each others pay rates were, she did this only to create problems amongst the staff and for myself, she was successful in doing so because with in a period of 2 weeks we lost all remaining employees in the store with the exception of 1 FT and 1 PT assoc. Susan was also overheard in the store bragging about how she got away with all this paid time off and only went to the doctor 2 or 3 times.
    In July 03 while covering reviews with other mgrs in the region I was told by Eileen Maurice store mgr of Zales Outlet #2780, a good friend of Susan's that she was contacted by Susan who tried to get Eileen to take the same leave. Her statement was Susan called me and said I should do the same to you(meaning myself) and the company as she did. That Susan could tell Eileen how she "got away with it" and "what do they owe the company anyway". Eileen told Susan she could not afford to be out of work and she had no reason to do such a thing, Susan told her she could use the time to find a better job and would get paid for it anyway. Eileen Maurice mgr 2780 and Gaynor Till assoc in our store 2708 still have social contact with Susan but I have not heard of any further such conversations until recently when I was told by Gaynor Till that Susan was now in the process of trying to open her own local jewelery establishment somewhere in town and that if that happened Gaynor would probably join her. I was also informed by Federico Rojas-Lavado mgr 2723 that while covering the store for a few days in late July 03 there was talk in the store that some of the employees had been told by Susan she was looking for a way to sue the company for wrongful termination.
    This is as much and as detailed information I can recall at this time regarding this matter.

Jamie Marcil – RM Zales Outlet NE

EXHIBIT
43-Marcil
10/24/05 (KE)

000119