Case 3:04-cv-30152-MAP   Document 32-10   Filed 01/31/2006   Page 1 of 23

Page 1

UNITED STATES DISTRICT COURT

District of Massachusetts

Civil Action No. 3:04-CV-30152MAP


*******************************************

SUSAN MOUNT,                                    *

          Plaintiff                           *

v.                                              *

ZALE DELAWARE,                                  *

          Defendant                           *

*******************************************



DEPOSITION OF:   SUSAN MOUNT

Catuogno Court Reporting Services, Inc.

1414 Main Street

Springfield, Massachusetts

November 2, 2005   10:15 a.m.




Lora A. Monroe


Certified Shorthand Reporter-807190

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**SUSAN MOUNT**
**November 2, 2005**

Page 46

1  position at Zales.
2      Q.    When you say a lot of hours, can
3  you give me any sort of estimate?
4      A.    I'm sure there was weeks that I was
5  working fifty, sixty hours. I'm sure that there
6  was weeks I was working forty.
7      Q.    And when you -- this period that
8  you're referring to, can you give me any
9  estimate as to a beginning and end time for the
10  period you're talking about?
11     A.    I would roughly say the store
12  opened in the latter part of July. I would say
13  probably the first six to eight months was a
14  hard duration with a lot of turnover in the
15  store and just familiarizing myself with the
16  company and the needs of my particular store and
17  how to effectively run it.
18     Q.    And during the -- strike that.
19         The mall that the Lee store is in
20  during the period that you worked there, what
21  was the opening and closing hours of the mall?
22     A.    The mall, they were open from ten
23  until nine Monday through Saturday. And eleven
24  to six on Sunday. They did have winter hours

Page 47

1  which took place January 1st through the end of
2  March of which the center would be closed Monday
3  through Thursday at six. Friday and Saturday
4  they would stay open until nine. And Sunday,
5  strike that, Sunday was eleven to six and
6  non-winter hours, Sunday was ten to six.
7      Q.    Okay. And you referred to the
8  center a minute ago, what were you referring to?
9      A.    Prime Outlets at Lee.
10     Q.    I didn't know if you were referring
11  to some portion of the mall?
12     A.    No.
13  *  Q.    As of the time then that Mr.
14  Gretsky came on board, late spring, early summer
15  of 2000, do you remember what kind of schedule
16  you were inserting for yourself on a weekly
17  schedule that you completed?
18     A.    Can we take a short break?
19     Q.    Sure.
20
21         (Off record discussion)
22
23         MR. McNAMARA: Back on the record.
24  I would just like the record to

Page 48

1  reflect that we went on break at 10:58 and
2  after I asked that question, it is 11:06
3  when they returned.
4      Q.    (By Mr. McNamara) Do you have an
5  answer to the question?
6      A.    Can you repeat it?
7         MR. McNAMARA: Could you read it
8  back, please.
9
10     *  (Question read back)
11
12         MR. SHEA: Do you mean what kind
13  of hours was that?
14         MR. McNAMARA: What kind of hours
15  and how were those hours allocated.
16         MR. SHEA: Okay.
17         THE WITNESS: Without seeing an
18  actual schedule I don't recollect from week
19  to week because again it varied on the
20  store's needs. However, I do remember that
21  I was pregnant in the latter part of 2000
22  and under doctor's recommendation, he
23  recommended that I work no more than forty
24  hours.

Page 49

1      Q.    (By Mr. McNamara) For what period
2  was that?
3      A.    Without seeing the documentation
4  I'd have to assume it was for my pregnancy.
5      Q.    When was your son born?
6      A.    He was born in January of 2001.
7      Q.    And for how long prior to his birth
8  do you believe that your doctor recommended that
9  you work only forty hours a week?
10     A.    Approximately four months.
11     Q.    Okay. And go back for a moment.
12     A.    Sure.
13     Q.    Ms. Mount, normally when I ask a
14  question I don't let people leave before they
15  answer.
16     A.    Okay.
17     Q.    And I will accommodate you at any
18  time during the deposition but I'm not going to
19  agree to let you take a break while there's a
20  question pending. I'll ask that you answer the
21  question and then you're free to take a break
22  and do whatever you need to do.
23     A.    Sure.
24     Q.    Well, again, in the period at about

13 (Pages 46 to 49)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**SUSAN MOUNT**
**November 2, 2005**

Page 54

1    MR. McNAMARA: I'd prefer that you
2  not insert yourself into the testimony.
3    MR. SHEA: I'm going to object
4  then.
5    MR. McNAMARA: Then you object.
6    MR. SHEA: And state for the
7  record, let me just state for the record,
8  if you're mischaracterizing her testimony,
9  and I honestly believe you are, then I'm
10  going to state my objection to the record.
11  And I'm going to state how I think you're
12  mischaracterizing her testimony and I'll
13  leave it at that.
14    MR. McNAMARA: Fine. I prefer you
15  not lead the witness, however.
16    MR. SHEA: I don't think I am.
17    Q.  (By Mr. McNamara) The store
18  schedules that you saw at Holyoke were during
19  the period that you worked there for your
20  training sessions, correct?
21    A.  Yes.
22    Q.  And that was in the June, July
23  period of 1999?
24    A.  Correct.

Page 55

1    Q.  That would not have included the
2  holiday period, correct?
3    A.  Correct.
4    Q.  And during that period did you see
5  store schedules at Holyoke that had a
6  forty-eight hour schedule for a manager?
7    A.  No.
8    Q.  Because the manager was having some
9  health problems at the time?
10    A.  As far as I know, yes.
11    Q.  At that time did you see a model
12  store schedule?
13    A.  For the Zale store, yes.
14    Q.  And how many hours did that model
15  schedule indicate for a store manager?
16    A.  Without seeing the actual schedule,
17  I would assume that it was roughly,
18  approximately forty-eight.
19    Q.  And was it your understanding that
20  that was for a holiday period?
21    A.  That particular schedule, again
22  without seeing it, I would not be able to answer
23  that.
24    Q.  Was it your understanding that

Page 56

1  during holiday periods -- well, strike that.
2    Did you have an understanding about
3  the time expectation of store managers in Zale
4  Outlet for the holiday period being, say,
5  Thanksgiving to Christmas?
6    A.  Yes.
7    Q.  Generally. And what was that
8  understanding?
9    A.  In October we were given a schedule
10  of approximately a six week duration of a
11  managers mock and ideal schedule, allocated
12  payroll hours and payroll budget.
13    Q.  And do you remember approximately
14  what, how many hours were included on that
15  schedule for store managers?
16    A.  It increased.
17    Q.  Excuse me?
18    A.  It increased.
19    Q.  From what?
20    A.  From, it went from the week, I
21  believe prior with Thanksgiving included, was
22  thirty-nine and increased up to approximately
23  eighty through the duration of the Christmas
24  season.

Page 57

1    * Q.  So your understanding during the
2  Christmas season that you were expected to work,
3  depending on the week involved, up to eighty
4  hours per week?
5    A.  Yes.
6    Q.  Thank you. During the year 2001 --
7  strike that for a moment.
8    Your second son you say was born in
9  January of 2001, correct?
10    A.  Correct.
11    Q.  And when was your first son born?
12    A.  January of 1994. I'm sorry, but
13  the question that was prior to that, I'm
14  thinking I quickly answered and wasn't totally
15  sure of your question. Could we go back to that
16  or is that not allowed.
17    Q.  Was the -- I don't know what the
18  question was.
19    A.  Something about the eighty hours
20  for holiday.
21    MR. McNAMARA: Could you read the
22  question back.
23
24    * (Question read back)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**SUSAN MOUNT**
**November 2, 2005**

Page 66

1    Q.    What did you tell him?
2    A.    I told him that I loved my
3    position. Although they were offering more
4    money, money isn't everything. And I'd love to
5    stay with Zales. And I have to take a break.
6         MR. McNAMARA: Okay.
7
8         (Break taken)
9
10        MR. McNAMARA: Back on the record.
11   Q.    (By Mr. McNamara) Okay. Ms.
12   Mount, with respect to Movado, do you remember
13   how much money they offered you?
14   A.    Without speculating I don't know
15   exactly. It was roughly around forty. I want
16   to say forty-two or forty-four thousand.
17   Q.    And was there, to your
18   understanding, opportunities for earning bonuses
19   or commissions on top of that?
20   A.    There -- yes, there was.
21   Q.    And what were you earning as base
22   salary at Zale at that point?
23   A.    Thirty-six, I believe.
24   Q.    Okay. And what was the schedule

Page 67

1    that you would have worked at Movado if you
2    would have chosen to go there at this time?
3    A.    They didn't show me specific
4    schedules.
5    Q.    Do you know the number of hours you
6    would have been expected to work if you were
7    going to go there at that time?
8    A.    Minimum of forty.
9    Q.    And why did you choose not to go
10   Movado?
11   A.    Because I loved my position at
12   Zale.
13   Q.    With respect to the schedules that
14   you filled out on a weekly basis, did you
15   typically work the hours that you put on that
16   schedule?
17   A.    Yes, I did.
18   Q.    Did there come a time prior to your
19   mother's death when she was no longer able to
20   take care of your son, your older son, as you
21   had indicated she had in the past?
22   A.    No.
23   Q.    So until when did the arrangements
24   that you described for me with respect to child

Page 68

1    care for your older son continue with your
2    mother?
3    A.    Until my termination.
4    Q.    Okay. And what about the child
5    care for your younger son, you indicated that
6    your father and stepmother would care for him?
7    A.    Yes.
8    Q.    How long did that arrangement last?
9    A.    Until October of 2002.
10   Q.    Okay. And that arrangement ended
11   at that time because why?
12   A.    My father passed away.
13   Q.    Did your stepmother then take care
14   of your younger son at that point?
15   A.    She was unable to.
16   Q.    So what child care arrangements did
17   you have for your younger son after the death of
18   your father?
19   A.    I arranged for a private home taker
20   to take care of him.
21   Q.    Do you remember who that was?
22   A.    Lisa Johnson.
23   Q.    And where does Lisa Johnson live?
24   A.    She lives in Pittsfield.

Page 69

1    Q.    And that's a home daycare?
2    A.    She -- it's a private home. She
3    just had her own child and my child.
4    Q.    So it's not larger --
5    A.    It wasn't a daycare.
6    Q.    It wasn't a facility?
7    A.    No.
8    Q.    And what hours, if you can remember
9    after the death of your father until your
10   leaving Zale, was Ms. Johnson available to care
11   for your younger son?
12   A.    During the day Monday through
13   Friday.
14   Q.    What hours?
15   A.    Eight to 5:30, six if need be.
16   Q.    But not after six?
17   A.    No. My husband was home at evening
18   times to take care of our children.
19   Q.    Was there a reason that your mother
20   did not take care of your younger son during
21   that period?
22   A.    She was not able to care for an
23   infant.
24   Q.    Okay. How much did you pay Ms.

18 (Pages 66 to 69)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# SUSAN MOUNT
## November 2, 2005

---

Page 70

1  Johnson on a weekly basis for daycare of your
2  son?
3      A.    Approximately seventy-five to a
4  hundred.
5      Q.    Depending on the number of hours?
6      A.    Depending on the number of days.
7  It's twenty-five dollars a day.
8      Q.    Okay. Thank you. You said earlier
9  when we were talking about an earlier time
10  period that on the weekend your father and
11  stepmother would care for both of your children.
12  Did there come a time when your husband started
13  taking care of your children on weekends?
14      A.    Yes.
15      Q.    When did that take place?
16      A.    When he left Golf Day.
17      Q.    And that was?
18      A.    Two thousand one.
19      Q.    Now, in -- strike that.
20          Are you familiar with the term
21  store manager of the year?
22      A.    Yes, I am.
23      Q.    Do you know what did that refer to?
24      A.    The store manager of the year is a

---

Page 71

1  criteria for managers to achieve as status in
2  different volume groups.
3      Q.    And is there a store manager of the
4  year within Zale Corporation for each of the
5  branches of Zale?
6      A.    I do not know.
7      Q.    Was there, when I say store manager
8  of the year, is your particular understanding
9  with respect to store manager of the year for
10  Zale Outlet?
11      A.    Yes.
12      Q.    And is that a nationwide
13  competition or regional competition?
14      A.    Nation.
15      Q.    Did there come a time in 2002 when
16  you had discussions with Mr. Marcil and Vicki
17  McGuire of Zale regarding the store manager of
18  the year?
19      A.    Yes.
20      Q.    Mr. Marcil at the time was your
21  regional manager?
22      A.    Correct.
23      Q.    And who is Ms. McGuire?
24      A.    Ms. McGuire was vice president of

---

Page 72

1  operations.
2      Q.    For Zale Outlet?
3      A.    Correct.
4      Q.    And what was the nature of the
5  conversation or conversations you had with them?
6  First of all, let me strike that.
7          Did you have a conversation with
8  both Mr. Marcil and Mrs. McGuire?
9      A.    Yes.
10      Q.    Did you have conversations
11  separately with either of them?
12      A.    Yes.
13      Q.    How many conversations did you have
14  with Mr. Marcil alone, just you and he, about
15  the store manager of the year issue?
16      A.    Approximately two or three.
17      Q.    And how many conversations did you
18  have with Mrs. McGuire, just you and she,
19  regarding store manager of the year?
20      A.    One.
21      Q.    And did you have any conversations
22  that involved you and Mr. Marcil and Mrs.
23  McGuire regarding store manager of the year?
24      A.    The conference call that announced

---

Page 73

1  the manager of the year, which was in the latter
2  part of October.
3      Q.    Did that conference call include
4  people in addition to yourself, Mr. Marcil and
5  Mrs. McGuire?
6      A.    Yes, it did.
7      Q.    So do I take it that you did not
8  have any conversation where it was just you and
9  Mr. Marcil and Mrs. McGuire?
10      A.    To my knowledge no.
11      Q.    Okay. Who did you speak to first
12  regarding store manager of the year, Mr. Marcil
13  or Mrs. McGuire?
14      A.    Mr. Marcil.
15      Q.    And you said you had two or three
16  conversations with him?
17      A.    Correct.
18      Q.    Okay. Can you remember the first
19  conversation?
20      A.    In specifics, no, but I can tell
21  you details of what --
22      Q.    Please tell me as much as you can
23  remember. And tell me approximately when that
24  first conversation took place.

---

19  (Pages 70 to 73)

## CATUOGNO COURT REPORTING SERVICES
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**SUSAN MOUNT**
**November 2, 2005**

Page 74

1    A.    It would have been the very end of
2  October. And it was just in question of the
3  announcement of the manager of the year. And we
4  talked about the ranking sheets and the
5  discrepancy in my ranking versus the young
6  gentleman that won in our volume category as to
7  why I wouldn't have gotten the award.
8    Q.    What was your understanding at that
9  point of what the criteria was for determining
10  who was store manager of the year?
11    A.    Thirty-five percent was your sales.
12    Q.    Store sales?
13    A.    Uh-huh. Twenty percent was credit
14  cards. Fifteen percent, controllable expenses,
15  fifteen percent was ESA's.
16    Q.    I'm sorry?
17    A.    ESA's, extended service agreements.
18  And I don't know what percentage were at but the
19  rest was repair, profit and payroll, I believe.
20    Q.    And that's right. I think you're
21  85 without -- so that last category was?
22    A.    There was two different categories.
23  One was worth 10 percent, one was worth 5
24  percent. Without seeing it, I don't know

Page 75

1  exactly, but the main criteria was sales of 35
2  percent.
3    Q.    And what did Mr. Marcil say to you
4  during that first conversation regarding the
5  store manager of the year issue?
6    A.    He said looking at the ranking
7  sheets, with you being ranked at number seven
8  and Dan Baker being ranked at number 39, maybe
9  we are missing something. And I asked him
10  because we were working at the nine month
11  ranking, could he provide me with the 12 month
12  ranking. And he said he's going to look into
13  it.
14    Q.    Now, when you say that the other
15  person's name was Baker?
16    A.    Dan Baker.
17    Q.    He was ranked seven?
18    A.    I was ranked seven.
19    Q.    You were ranked seven in what
20  category?
21    A.    Total. All of them combined.
22    Q.    Okay.
23    A.    Throughout the company of over
24  eighty stores.

Page 76

1    Q.    Of Zale Outlet?
2    A.    Uh-huh.
3    Q.    And when you're ranked seven, that
4  was seven for all volume categories?
5    A.    For all volume categories.
6    Q.    And that would have put you at
7  number one in your particular volume category?
8    A.    That's what I believed, yes.
9    Q.    And what did you understand Mr.
10  Marcil to mean when he said perhaps we are
11  missing something?
12    A.    That because we had the nine month
13  ranking sheet that maybe something was different
14  in the twelve month ranking.
15    Q.    Okay. Did you have a subsequent
16  conversation with Mr. Marcil regarding the store
17  manager of the year issue?
18    A.    Yes.
19    Q.    And what happened in that
20  conversation?
21    A.    He said that Vicki was got going to
22  provide us with the information.
23    Q.    How long after the first
24  conversation was your second conversation with

Page 77

1  Mr. Marcil?
2    A.    A few days.
3    Q.    And how long was that second
4  conversation?
5    A.    I do not remember.
6    Q.    Did you have a subsequent
7  conversation with Mr. Marcil regarding the store
8  manager of the year conversation at about that
9  time period?
10    A.    I do not remember. I remember that
11  I asked, you know, if I could, if Vicki wasn't
12  going to provide us with the ranking sheets if
13  it was possible that I could speak to her so
14  that I had the proper understanding of how the
15  rankings were applicable to the final decision.
16    Q.    And did you have that conversation
17  with her?
18    A.    Yes.
19    Q.    When did that take place?
20    A.    That took place probably in the
21  beginning of November.
22    Q.    And do you remember what she said
23  in that conversation and what you said?
24    A.    I remember asking to give details

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**SUSAN MOUNT**
**November 2, 2005**

Page 82

1  forty hours over the course of a week, did you
2  have, for lack of a better term, a regular
3  schedule? In other words, did you generally
4  give yourself the same hours on the same days
5  each week?
6      A.    Generally, yes.
7      Q.    And what was that schedule
8  generally?
9      A.    Generally, and again without seeing
10  the exact schedule, it was, I usually had
11  Sunday's and Wednesday's off.
12      Q.    And as to the other days, were
13  there particular hours that you would
14  customarily work?
15      A.    Again, without seeing the schedule,
16  specifically Saturdays I would either work eight
17  to six if I held a meeting in the store or
18  twelve to nine-thirty.
19      Q.    Uh-huh.
20      A.    And on a typical basis, Monday,
21  Tuesday, Thursday and Friday I'd be scheduled
22  nine-fifteen to five, five-thirty, six. Again
23  without having a specific schedule.
24      Q.    But nine-fifteen to between five

Page 83

1  and six?
2      A.    Hm-hmm.
3      Q.    When your father died did you take
4  some time off then?
5      A.    I had in September had a
6  conversation with Jamie or strike that -- yes, I
7  took some time.
8      Q.    Did you have a conversation with
9  Mr. Marcil about taking time off in September of
10  2002?
11      A.    We had a conversation in September,
12  yes.
13      Q.    And what was the nature of that
14  conversation?
15      A.    I told him that I may be taking a
16  leave of absence to take care for my emotions
17  and for my father. I asked if I could take a
18  week's vacation to summarize things. And that I
19  would have more of a better idea after having
20  that vacation.
21      Q.    And what did he say?
22      A.    Yes.
23      Q.    How much time -- strike that.
24          When did your father die, do you

Page 84

1  remember the date?
2      A.    October 8.
3      Q.    And how much time did you take off
4  in October?
5      A.    I had my week's scheduled vacation,
6  which was scheduled for October 9 through, I
7  believe the 18. Again, without seeing the
8  schedule I'm speculating.
9      Q.    I understand.
10      A.    And then I have my applicable
11  bereavement time.
12      Q.    How much time was that?
13      A.    Again, without seeing it, I'm not
14  sure. I believe it was three days.
15      Q.    When you came back after your
16  father's death did you have a conversation with
17  Mr. Marcil regarding the upcoming holiday
18  schedule?
19      A.    We had a conversation, yes.
20      Q.    And what was the nature of that
21  conversation?
22      A.    I had missed the manager's meeting
23  so he had given me all the documentation and
24  information packet that was given out at that

Page 85

1  meeting.
2      Q.    Do you remember -- well, strike
3  that.
4          During the course of your meeting
5  where he gave you that packet, did you and he
6  discuss the number of hours that were expected
7  of a store manager for that 2002 holiday period?
8      A.    We never discussed a specific
9  requirement for myself.
10      Q.    Okay. Did you discuss in general
11  during that meeting the time commitment that
12  would be expected of a store manager for that
13  2002 holiday period?
14      A.    No.
15      Q.    Did he give you a model schedule
16  for that period?
17      A.    Yes, he did.
18      Q.    Do you remember the range of hours
19  that were indicated on that holiday schedule?
20      A.    Thirty-nine to eighty, I'd have to
21  presume.
22      Q.    And to the best of your memory did
23  you comply with that schedule that year?
24      A.    To the best of my -- did I comply

22  (Pages 82 to 85)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**SUSAN MOUNT**
**November 2, 2005**

Page 110

1  Sometimes as long as fifteen to twenty.
2  Q.  Okay.  Now, the candle making
3  sessions you refer to?
4  A.  Yes.
5  Q.  When did they take place?
6  A.  Again, it's speculation because I
7  don't specifically recall.  I want to say
8  January.  It might have been December or
9  January.
10  Q.  And that was one session?
11  A.  Yes.
12  Q.  And what did that consist of?
13  A.  It consisted of other individuals,
14  me and my stepmother attended and there was
15  other individuals that have suffered a loss and
16  they get together, they suggested you bring in
17  material, pictures or memorandums that you would
18  remember your loved one by and you made a candle
19  in remembrance of them of which you got to keep
20  with you and that you had open discussions with
21  others as to how they were feeling or different
22  emotions that you have overcome or happy
23  thoughts, sad thoughts.  There was probably
24  twenty people attending that.

Page 111

1  Q.  Okay.  Were there more than one of
2  these sessions that you went do?
3  A.  I went through one for my mother as
4  well.
5  Q.  And in turn -- strike that.
6  So is it fair to say then that from
7  December 31, 2002 you had never sought the
8  assistance of a psychiatrist or a therapist or
9  another medical professional with respect to
10  this depression?
11  A.  That would be fair to say.
12  Q.  How about after that period in
13  2003, did you consult with any medical
14  professionals regarding your depression?
15  A.  Yes, I did.
16  Q.  Who were they?
17  A.  Gabbie Elston Ferry.
18  Q.  And who is she?
19  A.  She's my primary physician.
20  Q.  Is she a physician?
21  A.  I'm sorry, a nurse practitioner is
22  her technical term.
23  Q.  And when did you consult with her
24  regarding depression?

Page 112

1  A.  March of '03.
2  Q.  And what was the purpose of your
3  visit to her that day?
4  A.  My purpose was, I needed an annual
5  exam as well as to discuss my emotions of severe
6  depression and anxiety of being overwhelmed.
7  Q.  And what, if any, suggestions or
8  prescriptions or referrals did Ms. Elston Ferry
9  give you in that session?
10  A.  She suggested that I seek
11  counseling through a therapist.  She gave me a
12  reference of a name.  She talked about possible
13  medications, but knew my view on medications.
14  That I try to stay clear of anything that I can
15  get addicted to.
16  Q.  Okay.  Do you remember who she
17  referred you to?
18  A.  Mitrakul, Susan Mitrakul.
19  MR. McNAMARA:  Mark this as
20  Exhibit 3.
21
22  (Exhibit 3, Medical Records,
23  marked)
24

Page 113

1  Q.  (By Mr. McNamara)  Ms. Mount, these
2  are medical records produced by your physician.
3  You can see on the first page there is the name
4  Gabriele Elston Ferry.  I'm going to refer you
5  to a couple of different spots.  I know you did
6  not write these, but ask if you understand what
7  they're referring to?
8  A.  Sure.
9  Q.  If you can further elaborate.  If
10  you go, and again these are in reverse
11  chronological orders.  If you go to the third
12  page from the back.  Handwriting there appears
13  to be similar to that of Ms. Elston Ferry.  And
14  it states under 3/14/03 10 a.m., reviewed, C
15  with a line over it, which I think means with
16  patient, discussed, this sign I think means
17  medication options.  Has not made appointment
18  with, looks like Kanhar.  Do you know, do you
19  recognize that name?  Does that look familiar to
20  you?
21  A.  That does not.
22  Q.  Okay.
23  A.  But if I may, this is regarding
24  lower back pain of which I had X-rays on.  And

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**SUSAN MOUNT**
**November 2, 2005**

Page 114

1  that's who Eugene Heyman is.
2     Q.  Okay.
3     A.  So I think it's in reference to my
4  back which -- can I take a moment.
5     Q.  Sure.
6     A.  That may be the name of Dr.
7  Finelly, I'm not sure what he was.  He might
8  have been who I had to go see for my back.  I'm
9  not sure, but -- not sure.
10     Q.  That's it with this for now.  We'll
11  probably go back to this document later so just
12  keep it by you.  After seeing -- strike that.
13        Did Ms. Elston Ferry make any
14  suggestion to you that you take time off from
15  work?
16     A.  She, we discussed an option of an
17  FMLA.  That there was a leave available.
18     Q.  And what did she say about that?
19     A.  She said, again, it's speculation
20  because it's going back, and I'm not specific,
21  because I was severely depressed and was not
22  able to perform my regular duties, that I can
23  ask for an FMLA leave and fill out an
24  application.  And I may be allowed a 12 week

Page 115

1  period of time to take care of my needs.
2     Q.  Now, at this point by the time you
3  saw Ms. Elston Ferry had there been any change
4  in how the depression affected you on a daily
5  basis?
6     A.  Yes, I would say there was.
7     Q.  And what was that change?
8     A.  I seemed to be, as I spoke prior, I
9  was unable to do social activity and unhappy.
10  And it seemed in January things compounded after
11  the busyness of the season surpassed us and I
12  had to face reality of life again and I was
13  unable to enjoy things.  Even at work I would
14  find myself in the back room a lot just crying
15  and not being able to train my staff
16  accordingly.  You know, I used to be excited
17  over the training sessions on Saturday morning
18  and I just found it very hard for myself to
19  perform the regular duties that I once did so
20  well.
21     Q.  Anything other than that in terms
22  of the additional effects of the depression on
23  your daily life?
24     A.  Still lack of sleep and anxiety.

Page 116

1     Q.  Did you, after having the
2  conversation with Ms. Elston Ferry regarding
3  FMLA, did you bring the subject up with Jamie
4  Marcil, your regional manager?
5     A.  I'm sorry, prior to?
6     Q.  I said after.
7     A.  After, yes.
8     Q.  And do you remember how long after
9  your visit with Ms. Elston Ferry on March 25 you
10  had that discussion with Mr. Marcil?
11     A.  I contacted him by phone, said
12  there was something I needed to discuss with
13  him.  He asked if we could do it over the phone.
14  I said I needed to do it in person.  We had an
15  appointment scheduled for what would have been a
16  week after that.  Unfortunately, he'd had to
17  change our meeting.  He had demands and needs
18  somewhere else in the region.  We met together
19  somewhere, I believe, on the first, somewhere
20  around April 7 to within that first week.  I
21  would say around April 7.
22     Q.  And where did you meet?
23     A.  He made a store visit to my store
24  and we went out to lunch to discuss matters.

Page 117

1     Q.  And what did you say during that
2  lunch and what did he say?
3     A.  I told him that I needed to request
4  a leave of absence.  And he took a sigh of
5  relief and said you're not resigning.  I said
6  no.  I need a leave.  And he said that he was
7  worried because I wouldn't talk to him on the
8  phone that I was leaving the company.
9     Q.  Okay.
10     A.  And we discussed the fact that I
11  was crying and emotionally disturbed and unhappy
12  with everything that life was providing around
13  me.  And the death of my father, I haven't
14  gotten over things.  And my son who has ADHD who
15  also was showing symptoms of depression and
16  aggression at school.  That I had seen my doctor
17  and discussed me taking a leave.  And I
18  needed to know what steps that I had to take to
19  take that.
20        Can I go to the bathroom?  Can we
21  take a break?
22        MR. McNAMARA:  Sure.
23
24        (Break taken)

30  (Pages 114 to 117)

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# SUSAN MOUNT
## November 2, 2005

Page 118

1
2    Q.    (By Mr. McNamara)  Ms. Mount, when
3  you met with Mr. Marcil on April 7 over lunch
4  and told him that you needed to take some FMLA
5  leave, did he indicate to you that he was either
6  annoyed by or objected to this request?
7    A.    Can I just clarify that I'm not
8  specifically sure it was the 7th, but it was on
9  or about.
10    Q.    I understand.
11    A.    And I'm sorry your question was
12  what.  Did he seem annoyed?
13    Q.    Did he indicate to you that he was
14  either annoyed or objected to your request for
15  leave?
16    A.    He really didn't show any emotion
17  to either.
18    Q.    Did you -- but you did say that --
19    A.    His initial reaction.
20    Q.    You interpreted as a sigh of relief
21  your not resigning?
22    A.    Yes.  That was my initial reaction,
23  correct.
24    Q.    Did he then tell you what you

Page 119

1  needed to do in order to request the FMLA leave?
2    A.    He said that there was
3  documentation that needed to be filled out.  He
4  would confer with human resources to make sure
5  that he got the appropriate documents to me.
6    Q.    Okay.  Mark this please.
7
8          (Exhibit 4, Leave of Absence
9          Application, marked)
10
11    Q.    (By Mr. McNamara)  Defendant's
12  Exhibit 4, Ms. Mount, is entitled Leave of
13  Absence Application.  Is this the application
14  that you completed and submitted in which you
15  request FMLA time?
16    A.    This is part of it.  There was also
17  documentation that I needed to get from my
18  doctor.
19    Q.    Okay.  And we'll be looking at that
20  in the minute.  Is this the portion that you
21  filled out yourself and signed?
22    A.    Yes.
23    Q.    Okay.  And on the first page is
24  this all your writing?

Page 120

1    A.    Yes, it is.
2    Q.    Okay.  And on the second page is
3  that your signature?
4    A.    It is.  Yes, it is.
5    Q.    Under employee signature?
6    A.    Yes.
7    Q.    And what did you do with this
8  document when you completed filling it out?
9    A.    This document was with the doctor's
10  medical information that Gabbie filled out and
11  signed off on and then returned to me on the
12  17th, I believe.
13          MR. McNAMARA:  Mark this as Exhibit
14  5, please.
15
16          (Exhibit 5, Certification of Health
17          Care Provider, marked)
18
19    Q.    (By Mr. McNamara)  Exhibit 5, Ms.
20  Mount, is a Certification of Health Care
21  Provider.  Is this the document you're referring
22  to that was filled out by Ms. Elston Ferry?
23    A.    Yes, that's the rest of that.
24    Q.    So you gave her this document and

Page 121

1  she returned it to you?
2    A.    Correct.
3    Q.    And you submitted both of those
4  documents to work?
5    A.    To Jamie.
6          MR. McNAMARA:  Okay.  Mark this
7  Exhibit 6.
8
9          (Exhibit 6, Response to Request for
10          Leave of Absence, marked)
11
12    Q.    (By Mr. McNamara)  And Defendant's
13  Exhibit 6, Ms. Mount, is a response to request
14  for leave of absence dated April 21 addressed to
15  you.  Is this the response that you received to
16  your request for leave of absence?
17    A.    Yes, it is.
18    Q.    Okay.  Now, prior to your going out
19  on leave, did you have any other conversations
20  with Mr. Marcil regarding your leave or your
21  perspective return from the leave other than the
22  lunch conversation that you were to tell me
23  about?
24    A.    Yes.

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# PAGE  131

## DEPOSITION OF SUSAN MOUNT

# CONFIDENTIAL DOCUMENT

# FILED SEPARATELY UNDER SEAL

**SUSAN MOUNT**
**November 2, 2005**

Page 135

1  twelve sessions?
2      A.    Hm-hmm.
3      Q.    Did you subsequently go to twelve
4  weekly sessions of individual therapy?
5      A.    I did not.
6      Q.    Did you go to any?
7      A.    I went to this one.
8      Q.    Did you go to any after this one?
9      A.    She took a leave of absence and I
10  didn't feel comfortable starting all over with
11  someone new.
12      Q.    So you didn't go to anyone else
13  after this session?
14      A.    No.
15      Q.    Did you try to find someone else
16  with whom you would feel comfortable?
17      A.    She had scheduled, when she wrote
18  this, I didn't know that her request was once a
19  week for twelve weeks.  We discussed that I
20  would be meeting her weekly and we made an
21  appointment for the following week of which the
22  I got the phone call that she was taking a leave
23  of absence and they were referring me to
24  someone's else.  And again, I'm a very sheltered

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA    Worcester, MA    Boston, MA    Lawrence, MA    Providence, RI**

# SUSAN MOUNT
## November 2, 2005

Page 142

1      MR. McNAMARA: Mark this Exhibit 9,
2  please.
3
4      (Exhibit 9, Letter dated June 23,
5      2003, marked)
6
7      MR. McNAMARA: Back on the record.
8      Q.  (By Mr. McNamara) Ms. Mount, that
9  break was about 20 minutes.  Did you spend the
10  bunch of that time with your attorney?
11     A.  Yes, I did.
12     Q.  I'd ask if it's possible that we
13  just be able to go through and finish this now.
14     A.  I'll do my best.
15     Q.  Thank you.
16     MR. McNAMARA: Mark this Exhibit
17  10.
18
19     (Exhibit 10, Work Schedule
20     Weekending 7/3/03, marked)
21
22     Q.  (By Mr. McNamara) Ms. Mount, I'm
23  showing you a store schedule for the weekending
24  7/3/03.  Is this in your handwriting?

Page 143

1      A.  No, it is not.
2      Q.  Do you recognize that handwriting?
3      A.  Yes, I do.
4      Q.  The hours listed -- well, strike
5  that.
6          Do you understand the Susan, the
7  first name listed there, that refers to you?
8      A.  Uh-huh.
9      Q.  The hours listed there for Susan,
10  are those hours that you supplied to the person
11  who was filling out this schedule?
12     A.  Yes, I believe it was.
13     Q.  On the top right-hand corner it
14  indicates posted 6/19.  Do you understand that
15  to mean that this was posted in the store on
16  June 19?
17     A.  Without actually doing it, I could
18  not answer that.
19     Q.  Okay.  Do you have any memory as to
20  when you gave this schedule for yourself to the
21  person who was filling out this form?
22     A.  I would have to say it was on or
23  around the week before.
24     Q.  The week before what?

Page 144

1      A.  The 27th of June.
2      Q.  Could it be on or about June 19 you
3  gave this information?
4      A.  Yes, it could have been.
5      Q.  So on or about June 19 you gave
6  that information to the store.  Is it true that
7  then the following day you called the leave of
8  absence coordinator at Zale to seek an extension
9  of your leave until June 27?
10     A.  I will not say the following day
11  because I don't know exactly when this was
12  posted, but yes, I did have a conversation with
13  human resources on the 20th.
14     Q.  Okay.  And what was the reason that
15  you were requesting for an extension of your
16  leave until June 27?
17     A.  I had a conversation with Jamie
18  Marcil regarding my leave return date to be June
19  27.  He agreed that that date was accommodating
20  to the store's needs.  And said that I needed to
21  contact human resources to follow through with
22  any applicable paperwork.
23     Q.  Okay.  So then after the
24  conversation on June 20 with Janet Wells, did

Page 145

1  you receive the letter which is marked as
2  Exhibit 9 dated June 23?
3      A.  After my conversation with both
4  Jamie and Janet, yes, I received that letter.
5      Q.  And did you understand that letter
6  to grant your request to extend your leave until
7  June 27?
8      A.  Correct.  What was your question?
9      Q.  I said, did you understand the June
10  23 letter to be a document that told you that
11  you had been granted an extension of your leave
12  until June 27?
13     A.  I understood that my conversation
14  had granted me that.  This letter doesn't
15  necessarily say that.
16     Q.  I understand it doesn't say June
17  27.  That's why I asked did you understand it to
18  mean that you were granted a leave, extension of
19  your leave until June 27?
20     MR. SHEA: The letter or the
21  conversation?
22     MR. McNAMARA: The letter.
23     THE WITNESS: The letter, no.  The
24  conversation, yes.

37  (Pages 142 to 145)

**SUSAN MOUNT**
**November 2, 2005**

Page 146

1    Q.    (By Mr. McNamara) From the letter
2  or the conversation you understood that your
3  leave was granted, the extension of your leave
4  was granted until June 27?
5    A.    Correct.
6    Q.    Looking back at Exhibit 3, when I
7  asked you about where Ms. Elston Ferry's
8  indicated impression, that your stress and
9  depression were resolved, I asked you if she had
10 given you leave to return to work without any
11 restrictions.  And at that point when I asked
12 you about that a little while ago you referred
13 to a conversation with Mr. Marcil the night
14 before?
15   A.    Correct.
16   Q.    What conversation did you have with
17 him the night before?
18   A.    Mr. Marcil contacted me at home on
19 the evening of the 26th.  He stated that he just
20 received the schedule of my return and needed to
21 go over this.  And any ongoing schedules he
22 needed to adhere to a forty-eight hour, two
23 twelve hour manager mandatory schedule.
24   Q.    When you provided the information

Page 147

1  on Exhibit 10, the schedule information, how
2  many hours was that that you provided?
3    A.    It appears to be about forty,
4  forty-one.
5    Q.    Okay.  I will represent to you that
6  I added it, it's 39.5.  It's close.  Why did you
7  give these particular hours, was it Gaynor who
8  was taking that information?
9    A.    Correct.
10   Q.    Why did you give these particular
11 hours to Gaynor?
12   A.    Because it was typical of the
13 schedules that I had been working prior.
14   Q.    When Mr. Marcil called you on, you
15 say the night of the 26th?
16   A.    Correct.
17   Q.    And indicated what you just told me
18 he indicated, what did you say to him?
19   A.    I said why now are you changing my
20 schedule after I've taken my leave.  I'm ready
21 to come back to my schedule prior.
22   Q.    What did he say?
23   A.    He said that Vicki McGuire has
24 gotten aggressive with the manager's schedules

Page 148

1  and it's non-discriminatory and mandatory for
2  all managers to adhere to.  And I said given my
3  situation and my family needs after medical
4  leave, I don't know how I can adhere to that.
5  Is there anything we can do.  He stated it is
6  what it is.  It's non-discriminatory and I need
7  any and all schedules going forward to adhere to
8  it.
9        MR. SHEA:  She's not done.
10       THE WITNESS:  I'm not done.  And he
11 stated, any and all schedules need to
12 adhere to it.  I replied, so what you're
13 telling me is that if I cannot adhere to
14 this schedule, then I no longer have a
15 position with the company.  And he said
16 yes.  And he asked for my resignation
17 letter.  I told him he would not be getting
18 it.  I did not resign.  He terminated my
19 position.
20   Q.    (By Mr. McNamara) In your answer
21 you referred to, I believe, your family
22 situation.  And you said because of that you
23 couldn't comply with the forty-eight hour
24 schedule.  What were you referring to when you

Page 149

1  stated that?
2    A.    My depression and the whole reason
3  upon my leave and my depression and my son's
4  ADHD and aggression.
5    Q.    Okay.  So then -- strike that.
6        At that point what symptoms of
7  depression were you experiencing?
8    A.    At that point of the conversation?
9    Q.    At that point in June of 2003.
10   A.    In June of 2003, same as I
11 complained to you earlier.  Symptoms seemed to
12 have gotten better but I still was troubled at
13 night, but not as frequently as before.
14   Q.    Okay.  As a result of your June 26
15 meeting with Ms. Elston Ferry, did she --
16   A.    I'm sorry, what was the date you
17 said?
18   Q.    June 26.
19   A.    No.  My meeting with Gabbie was the
20 twenty-seventh.
21   Q.    Oh, sorry, you're right.  At your
22 meeting with Ms. Elston Ferry on June 27, did
23 she give you a document that allowed you to
24 return to work?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**SUSAN MOUNT**
**November 2, 2005**

| Page 150 | Page 152 |
|---|---|
| 1  A.  Yes, it is the medical. | 1  had prior to my leave. |
| 2  Q.  Okay. | 2  Q.  But based on the conversation with |
| 3  MR. McNAMARA:  Mark this Exhibit | 3  Mr. Marcil the night before where he said you |
| 4  11. | 4  need to return to a forty-eight hour a week |
| 5 | 5  schedule, why wouldn't you? |
| 6  (Exhibit 11, Note dated 6/27/03, | 6  A.  I felt my position was terminated. |
| 7  marked) | 7  Q.  Okay.  What did you do with this |
| 8 | 8  note when you received it? |
| 9  Q.  (By Mr. McNamara)  So as of June 27 | 9  A.  I kept this note and I sought legal |
| 10  you already had a conversation with Jamie Marcil | 10  advice. |
| 11  in which he told you that you had to adhere to a | 11  Q.  Did you ever send this note or a |
| 12  forty-eight hour a week schedule; is that | 12  copy of it to Zale? |
| 13  correct? | 13  A.  I sought legal representation and |
| 14  A.  He said that the manager's schedule | 14  eventually this note did get to Zale.  Exactly |
| 15  would be forty-eight hours and two twelve hour | 15  when, I don't know. |
| 16  shifts, yes. | 16  Q.  If I understand your testimony from |
| 17  Q.  Did you mention that to Ms. Elston | 17  a few minutes ago to be that one of the purposes |
| 18  Ferry? | 18  of the letter was to cover your extension of |
| 19  A.  We had the discussion regarding the | 19  leave to June 27 as requested in the June 23 |
| 20  fact that my position was terminated that | 20  letter, why did you not send, at least, a copy |
| 21  evening. | 21  of the June 27 note from Ms. Elston Ferry to |
| 22  MR. SHEA:  Meaning the previous | 22  Zale immediately after you received it? |
| 23  evening. | 23  MR. SHEA:  I think she's answered |
| 24  THE WITNESS:  The previous | 24  that.  She said she went to legal counsel. |

| Page 151 | Page 153 |
|---|---|
| 1  evening, correct.  We also discussed this | 1  MR. McNAMARA:  That's not an answer |
| 2  letter dated, Exhibit 9, of which there's | 2  to the question. |
| 3  a, see note from Zales in Exhibit 3. | 3  MR. SHEA:  I don't think she can |
| 4  Q.  (By Mr. McNamara)  If your | 4  talk about what legal counsel said. |
| 5  understanding was that your employment had been | 5  MR. McNAMARA:  I'm not asking her |
| 6  terminated on June 26 why did you ask Ms. Elston | 6  to say that.  I'm asking if she says, you |
| 7  Ferry to give you a note allowing you to return | 7  know, I can't answer that because it's |
| 8  to work? | 8  privileged, fine. |
| 9  A.  I followed up with my appointment | 9  MR. SHEA:  Okay. |
| 10  because I felt the need to follow-up with my | 10  MR. McNAMARA:  There you go, but -- |
| 11  depression.  We discussed what had happened and | 11  THE WITNESS:  I can't answer that |
| 12  she felt that because this letter was requesting | 12  because it's privileged. |
| 13  that I needed a medical doctor's note, that I | 13  Q.  (By Mr. McNamara)  How soon after |
| 14  should adhere to that and at least get a release | 14  receiving the June 23 letter did you seek legal |
| 15  note. | 15  counsel? |
| 16  Q.  Did you ask Ms. Elston Ferry to | 16  A.  I believe that's privileged |
| 17  indicate in the letter that you could only | 17  information. |
| 18  return to work for a forty hour per week | 18  Q.  It's not. |
| 19  schedule? | 19  MR. SHEA:  You can say what date. |
| 20  A.  I didn't ask that specific | 20  MR. McNAMARA:  The date is |
| 21  question, no. | 21  certainly not privileged. |
| 22  Q.  Why not? | 22  MR. SHEA:  Don't talk about the |
| 23  A.  I was ready and able to go back to | 23  conversation.  You can even say the name, |
| 24  the position and the job and the hours that I | 24  too, but not any communications. |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**SUSAN MOUNT**
**November 2, 2005**

Page 154

```
 1        THE WITNESS: Okay. Peter
 2   Sturgeon. And it would have been either
 3   June 30th or July 1st.
 4        Q.  (By Mr. McNamara) Okay.
 5        A.  Because it followed the weekend.
 6   The twenty-seventh was a Friday.
 7        Q.  I understand. During your leave
 8   did you have any telephone conversations with
 9   anyone who worked in the store.
10        A.  Yes, I did.
11        Q.  With whom?
12        A.  I had a phone call from several
13   individuals from the store. Specifically
14   Gaynor, Deb, Rhonda and Jamie.
15        Q.  How many conversations did you have
16   with Gaynor while you were on leave on the
17   telephone?
18        A.  I don't know in detail.
19        Q.  Was it more than one?
20        A.  Probably, yes.
21        Q.  Was it more than five?
22        A.  No.
23        Q.  What did you discuss in the
24   telephone conversations you had with Gaynor
```

Page 155

```
 1   during your leave?
 2        A.  Some were generalized conversations
 3   over how business was going or how I was doing.
 4   Some were, she was showing her disgust in the
 5   responsibility of the store and the amount of
 6   people that were leaving.
 7        Q.  Who did she say was leaving?
 8        A.  Shirley, Tiffany. Deb was taking a
 9   leave of absence. Amanda was taking a leave or
10   leaving, I'm sorry, not taking a leave. And
11   Rhonda had left.
12        Q.  Did Gaynor tell you in any of these
13   conversations about how the store was doing in
14   terms of sales?
15        A.  Not that I recall.
16        Q.  What conversations did you have
17   with Deb, is that Deb Halleck?
18        A.  Deb Halleck. We discussed her
19   taking a leave.
20        Q.  What did she tell you about that?
21        A.  She basically said that she was
22   taking a leave and Amanda was leaving the
23   company.
24        Q.  Did she tell you -- well, strike
```

Page 156

```
 1   that.
 2        How many conversations did you have
 3   with Deb during the leave?
 4        A.  I believe just the one, but I may
 5   be wrong.
 6        Q.  Did she tell you anything during
 7   that conversation regarding how the store was
 8   doing in terms of sales?
 9        A.  At this point I don't recall. I
10   just remember being frustrated by this point
11   because I felt that I was getting harassed from
12   people at work when I needed to separate myself
13   from them.
14        Q.  Who was harassing you?
15        A.  It wasn't that they were harassing
16   me. I took a leave of absence to separate
17   myself from the business side of the store. And
18   I felt that they still were calling me with
19   issues and complaints that I wasn't able and
20   ready to deal with at that time.
21        Q.  And who did that?
22        A.  Gaynor, Deb. I had a conversation
23   with Rhonda regarding her leaving and
24   subsequently Jamie upon him hiring two new
```

Page 157

```
 1   individuals.
 2        Q.  Did you ask Gaynor, Deb and Rhonda
 3   not to call you?
 4        A.  I believe, I believe I did. I
 5   believe I said they can call me, but please
 6   don't talk about any negativity that's going on
 7   to the store.
 8        Q.  And you mentioned that Jamie called
 9   you after he hired two people?
10        A.  Correct.
11        Q.  Do you remember approximately when
12   that was?
13        A.  Without looking at the schedules
14   and seeing new names on it, I don't know.
15   Sometime in the latter part of May to the early
16   part of June.
17        Q.  What did he tell you about that
18   conversation?
19        A.  He told me about that he had hired
20   two individuals. Shirley had gotten wind that
21   they were making more money than her and she was
22   there for three years prior. She was
23   dissatisfied and she was leaving, but that he
24   felt that was the right direction for the store
```

40  (Pages 154 to 157)

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**SUSAN MOUNT**
**November 2, 2005**

Page 158

1  to go in to.
2     Q.    Did you say anything to him in that
3  conversation?
4     A.    It sounds like my store's falling
5  apart. I will deal with it when I get back.
6     Q.    Going back to your June 26
7  conversation with Mr. Marcil, was that the only
8  conversation you had with him regarding your
9  schedule upon returning from work?
10    A.    Yes, it is.
11    Q.    Did he tell you in that
12  conversation that you could work those
13  forty-eight hours in any configuration that was
14  convenient to you as long as it was forty-eight
15  hours?
16    A.    Not exactly.
17    Q.    What did he say?
18    A.    What he did recommend, the two
19  twelve hour periods typically would be Monday
20  and Friday. And if at any time it's not working
21  with my husband's schedule he may be willing to
22  do a twelve hour day on Saturday.
23    Q.    And that was not satisfactory to
24  you?

Page 159

1     A.    Again, I was just asking to be
2  accommodating to the schedule that I had held
3  prior to my leave. And felt that with my
4  depression that working, that those reference of
5  hours wouldn't be good for my mental being.
6     Q.    And had Ms. Elston Ferry told you
7  that you should not be working more than forty
8  hours a week?
9     A.    I'm not sure if we had that
10  specific conversation as that.
11    Q.    Had any medical professional told
12  you that you should not be working more than
13  forty hours a week?
14    A.    The only medical profession I
15  sought was Gabbie.
16    MR. McNAMARA: Mark this as Exhibit
17  12.
18
19    (Exhibit 12, Letter dated June 26,
20    2003, marked)
21
22    Q.    (By Mr. McNamara) Did you have any
23  communications with Zale Corporation after your
24  June 26 conversation with Mr. Marcil?

Page 160

1     A.    No.
2     Q.    Did you receive a letter from Zale
3  Corporation after your conversation with Mr.
4  Marcil?
5     A.    Yes, I did.
6     Q.    Is that Defendant's 12, which I put
7  in front of you?
8     A.    Yes, it is.
9     Q.    The June 26 letter?
10    A.    That's the date on top of the
11  letter.
12    Q.    After you received this letter did
13  you attempt to contact Ms. Wheeler?
14    A.    I did not.
15    Q.    Why?
16    A.    I didn't receive it until July 1st
17  in which time I was under, seeking legal
18  representation with my lawyer.
19    Q.    But why didn't you call Ms. Wheeler
20  to explain to her your needs and see if
21  something could be resolved in your favor?
22    A.    I was under direction with my
23  attorney at that time and I already felt that my
24  position was terminated prior. And I got this

Page 161

1  letter on the 1st of July.
2     MR. McNAMARA: Mark this as
3  Exhibit 13.
4
5     (Exhibit 13, Response and Objection
6     to First Request for Production of
7     Documents, marked)
8
9     Q.    (By Mr. McNamara) Ms. Mount, I'm
10  showing you as 13, which is your Response and
11  Objections to Our First Request for Production
12  of Documents. If you would look at your
13  response to Number 9. It's where we asked for
14  income tax returns. I will note that we
15  received income tax returns and W2's for 2002,
16  2003 but have not received any for 2004. So I
17  would just like to put on the record that I
18  would like to get those as soon as possible.
19    MR. SHEA: Sure.
20    Q.    (By Mr. McNamara) Request Number
21  13 asks for cover letters and resumes you sent
22  to perspective employers and any offers of
23  employment received by you since you left Zale.
24  And you indicate there that you have no such

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

*EXHIBIT 7*

# EXHIBIT  7

**DEPOSITION OF SUSAN MOUNT**

## CONFIDENTIAL DOCUMENT

## FILED SEPARATELY UNDER SEAL

*EXHIBIT 9*



June 23, 2003


**VIA PRIORITY MAIL**

Susan Mount
26 Morewood Dr
Pittsfield, MA 01201

**FILE COPY**

RE:  **FMLA to Personal Leave**

Dear Susan:

According to our records you have been on a Family Medical Leave of Absence since April 19, 2003. As of June 22, 2003 you had exhausted the maximum leave time allowable under Zale family medical leave of absence policy. Recently, Zale was notified of your need for an extension to your current leave of absence.

Please let this letter confirm that you have been granted a personal leave.  However, since your medical leave entitlement has expired, you should understand that your leave is no longer job-protected. Should you receive a release to return to work, a position may or may not be available. However, Zale will attempt to place you in a position for which you qualify. If you need to request another extension, you will need to provide us the appropriate documentation. Please understand that the maximum leave time allowed under company policy is one year, unless otherwise provided by law.

While you are on a personal leave of absence, you will be responsible for paying your contribution until such time as you become ineligible for benefits based on averaging less than 30 hours per week.  When this occurs, you will receive a COBRA notice.

If you have any questions regarding your leave of absence, please do not hesitate to call me at (972) 580-5488.

Sincerely,


Janet Wells
Leave of Absence Coordinator

*EXHIBIT 10*

*Ronald 6/14*

# ZALE CORPORATION
SKU #10978522 (4/00)

Store # _2708_

Week Ending: _7 / 3 / 03_

Payroll Budget Hrs: _____     Payroll Budget $'s: _____

Payroll Actual Hrs: _____     Payroll Actual $'s: _____

Variance: _____              Variance: _____

EXHIBIT
#10   Susan
      mount
11.02.05 XM

| | FRIDAY | | SATURDAY | | SUNDAY | | MONDAY Switched per Susan | | TUESDAY | | WEDNESDAY | | THURSDAY | | WEEK TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Role Play Topic | 6/27/03 | | 6/28/03 | | 6/29/03 | | 6/30/03 | | 7/1/03 | | 7/2/3 | | 7/3/03 | | |
| Daily Sales Plan | $ | | $ | | $ | | $ | | $ | | $ | | $ | | |
| Employee Name | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | SHIFT | HRS | |
| Susan | 9¹⁵-5³ | | X-9³ | | — | | 6¹⁵ | | 9¹⁵-5 | | — | | 9¹⁵-5 | | |
| Shirley | — | REQ | — | REQ | | REQ | — | REQ | — | REQ | 9¹⁵-5 | REQ | 2-9³ | | |
| Tiffney | — | | 9¹⁵-5 | | 10¹⁵-6² | | 2-9³⁰ | | 2-9³ | | — | | 9¹⁵-5³⁰ | | |
| Corinne | 1-9³ | | 9¹⁵-5 | | 12³-6³ | | 9¹⁵-5 | | 9¹⁵—2¹ | | 2-9³ | | | | |
| Leigh | 5-9³ | | — | REQ | 10¹⁵-6³ | | | | — | | — | | 11-6 | | |
| Alice | — | | — | REQ | | REQ | 10-6 | | 8 | | — | | | | |
| Deb P. | 9¹⁵-2 | | (2-9³) | | — | REQ | | | 5—9³ | | 9¹⁵-2 | | | | |
| Carey | 9¹⁵-5³ | | — | | — | | 9¹⁵-5 | | 9¹⁵-5 | | 9¹⁵-5 | | 9¹⁵-5³⁰ | | |
| Grace | | | | | — | | 2-9³ | | | | 2-9³ | | 5-9³ | | |
| Valerie | | REQ | 5-9³ | | | | 5-9³ | | | | | | | | |
| Staffing Levels | / | | / | | / | | / | | / | | / | | / | | |
| Model Schedule | / | | / | | / | | / | | / | | / | | / | | |