*EXHIBIT 1*

**Loislaw Federal District Court Opinions**

DAVIS v. MOTHERS WORK, INC., (E.D.Pa. 2005)

BETTY DAVIS, Plaintiff, v. MOTHERS WORK, INC., doing business as

MOTHERHOOD MATERNITY, Defendant.

Civil Action No. 04-3943.

United States District Court, E.D. Pennsylvania.

August 4, 2005

**MEMORANDUM & ORDER**

WILLIAM YOHN, JR., District Judge

Plaintiff Betty Davis brings this employment discrimination and retaliation case under Title VII of the Civil Rights Act of 1964, **42 U.S.C. § 2000e** et seq. ("Title VII"), the Civil Rights Act of 1866, **42 U.S.C. § 1981** ("§ 1981"), and the Pennsylvania Human Relations Act, Pa. Stat. Ann., Tit. 43, § 951 et seq. ("PHRA").**[fn1]** Davis, an African-American and a Muslim, claims that her former employer, defendant Mothers Work, Inc., sent her home from work, made unfavorable changes to her work schedule, and discharged her, because of her race, her religion, and in retaliation for her complaints about racial and religious discrimination. Presently before the court is Mothers Work's motion for summary judgment pursuant to Federal Rule of Civil Procedure **56**(c). For the reasons set forth below, I will grant the motion in part.**[fn2]**
Page 2

I. FACTUAL BACKGROUND

A. Davis's Employment at Mothers Work

Defendant Mothers Work is the leading designer, manufacturer, and retailer of maternity clothing in the United States. (Decl. of Stephanie Worden ("Worden Decl.") at ¶ 2.) It operates over 1000 stores nationwide under the names "Mini Maternity," "Pea in the Pod," and "Motherhood Maternity." (Id.) Davis was hired by Mothers Work on May 28, 2002, as a part-time supervisor**[fn3]** at its "Motherhood Maternity" store in the King of Prussia shopping mall outside of Philadelphia. (Decl. of Betty Davis ("Davis Decl.") at ¶ 2.) According to Davis, she was interviewed and hired by the store manager, Debbie Parrish. (Id.) Mothers Work, on the other hand, has presented evidence that Davis was interviewed and hired by Stephanie Worden, the district manager responsible for the King of Prussia store. (Tr. of Dep. of Stephanie Worden ("Worden Dep.") at 48-49; Worden Dec. at ¶ 20.) Throughout Davis's employment at Mothers Work, she was one of two African-American employees at the King of Prussia location. (Davis Dep. at 100.)

In June 2002, shortly after Davis commenced her employment at

Mothers Work, she converted to Islam and began wearing Islamic overgarments, which consist of a full-length robe

Page 3

and a head scarf. (Tr. of Dep. of Betty Davis ("Davis Dep.") at 64, 257; Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 20.) Davis's overgarments arguably conflict with Mothers Work's employee dress code, which provides that employees must "[w]ear clothing that reflects the current in-store seasonal fashions." (Ex. E to Worden Dec.) The dress code policy also provides that management should contact the Human Resources Department "for any religious issues" that arise out of the policy.[fn4] (Id.)

On June 26, 2002, Worden first saw Davis wearing her overgarments and asked to speak with Davis and Parrish outside of the store. (Worden Dep. at 64.) The parties dispute what happened next. Davis and Parrish both testified that Worden ordered Davis to go home and remove her outfit because it was inconsistent with Mothers Work's employee dress code. (Davis Dep. at 158-59; Tr. of Dep. of Deborah Parrish ("Parrish Dep.") at 25.) Worden testified that she never ordered Davis to go home, but instead asked her "take a walk" around the mall while she contacted the Human Resources Department to determine whether Davis's overgarments were appropriate under the employee dress code. (Worden Dep. at 63-67.) Next, according to Davis, she explained that as a Muslim she was required to wear the overgarments and accused Worden of religious discrimination. (Davis Dec. at ¶ 7; Davis Dep. at 164; Parrish Dep. at 22.) Worden testified that Davis never told her that she was a Muslim. Worden also claims that at the time she believed that Davis's overgarments were a "Mormon outfit." (Worden Dep. at 70.)

Page 4

Davis contends that Worden was not always so vigilant in enforcing Mothers Work's employee dress code. Davis and Sheila Bradley, a co-manager at the King of Prussia store, both testified that Temperance Leister, a white, non-Muslim employee at the King of Prussia store, often wore tight-fitting shirts that exposed her "midriff," piercings in her eyebrows and lips, and colored hair, which all violate the employee dress code. (Davis Dep. at 280, 284; Bradley Dep. at 85-87.) According to Davis, Worden never sent Leister home for these violations of the dress code and never treated her any differently than other employees. (Id. at 281, 283-84.)

Following the June 26 incident, Mothers Work permitted Davis to wear her overgarments at work. (Davis Dep. at 168-69.) Nonetheless, Davis contends that Worden began treating her differently. According to Davis, Worden began spending more time than usual at the King of Prussia store and started closely monitoring Davis's work. (Id. at 103, 106-07.) Davis testified that Worden began speaking to her "rudely" and giving her "nasty looks." (Id. at 101-02.)

Davis also testified that her supervisors began changing her work schedule without consulting with her. (Id. at 150.) She claims that her supervisors rescheduled her for work-shifts that they knew conflicted with her second job. (Id. at 148, 150.) Bradley testified that Worden ordered Parrish to change Davis's work schedule on various occasions. (Tr. of Dep. of Sheila

Bradley ("Bradley Dep.") at 57, 64.) Bradley recalled one incident when Worden ordered Parrish to change Davis's work schedule so that Davis would not be present on a day when Mothers Work's owner was scheduled to visit. (Id. at 35.) According to Bradley, Worden said that she "[didn't] want [Davis] wearing that outfit" in front of the owner. (Id.)

Bradley testified that Worden often complained about Davis's overgarments to other employees. (Id. at 15, 52.) On one occasion, Worden allegedly told Bradley to ask Davis

**Page 5**

whether she had "to wear the whole uniform." (Id. at 53.)

Mothers Work has come forward with evidence that another employee at Mothers Work's King of Prussia store wore Islamic overgarments without incident. Davis's cousin, Tahira Kane, was employed at the King of Prussia store over the same period as Davis. (Davis Dep. at 138.) Parrish testified that Kane, who is apparently also a Muslim, came to work in similar overgarments "once or twice." (Parrish Dep. at 51.) According to Parrish, Kane was never sent home and never complained about any type of discrimination. (Id. at 52.) However, Parrish also testified that she did not think that Worden ever saw Kane wearing the overgarments. (Id.)

B. Davis's Termination

Mothers Work claims that Davis was terminated for violating its "no call/no show" policy. Mothers Work's "Termination Guidelines Policy" provides that an employee may be immediately terminated if she fails to appear for two consecutive shifts without calling to notify management. (Ex. C. to Worden Decl.) On August 16 and August 18, 2002, Davis called in sick. (Davis Decl. at ¶¶ 17-18.) According to Davis, the next day that she was scheduled to work was August 21. (Davis Dep. at 134.) According to Mothers Work, Davis was scheduled to work on August 19 and failed to appear or call to excuse her absence. (Ex. 3 to Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J.) When Davis arrived at work on August 21, Laura Baker, the new store manager, told Davis that she had assumed that Davis quit and asked her to go home and wait for Mothers Work to get back to her. (Id. at 135.) Two days later, Baker informed Davis that she had been terminated for violating Mothers Work's "no call/no show" policy. (Davis Decl. at ¶ 23.)

C. Davis's Efforts to Exhaust Her Administrative Remedies

**Page 6**

On June 26, 2002, immediately following the incident with Worden, Davis went to the Equal Employment Opportunity Commission ("EEOC") and completed an intake questionnaire. On the questionnaire, Davis only marked the box labeled "religion." (Ex. 38 to Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J.) She also alleged that after Worden asked her to change out of her overgarments, she told Worden that the overgarments were required by her religion. (Id.)

Davis returned to the EEOC office on October 28, 2002 and spoke with an investigator. She told the investigator that she directly opposed Worden's actions on June 26, 2002 and was discharged on

August 23, 2002. (Davis Decl. at ¶ 12.) Davis asserts that she assumed that the investigator would pursue a retaliation claim on the basis of these allegations. (*Id.* at ¶ 13.) That same day, the investigator prepared a formal charge of discrimination. The charge only includes claims for racial and religious discrimination. (Ex. 5 to Pl.'s Opp. to Def.'s Mot. for Summ. J.) Nonetheless, despite the fact that the charge as drafted made no reference to retaliation, Davis signed the charge that same day. (*Id.*)

On September 21, 2004, following an investigation into Davis's allegations, the EEOC determined that Mothers Work had violated Title VII's proscription against religious discrimination. (Ex. 23 to Pl.'s Mem. of Law in Opp. to Mot. for Summ. J.) The determination notice, however, like the charge, makes no reference to retaliation. (*Id.*) On October 1, 2004, the EEOC notified the parties that its efforts to conciliate the dispute had failed, and on February 18, 2005, the EEOC issued a right to sue letter. (Ex. 24 to Pl.'s Mem. of Law in Opp. to Mot. for Summ. J.)

In the meantime, on August 19, 2004, Davis filed this suit against Mothers Work under §
Page 7
1981, the PHRA, and Pennsylvania common law. On March 11, 2005, after Davis received the EOOC's right to sue letter, she amended the complaint to include causes of action under Title VII.

## II. STANDARD OF REVIEW

A court may only grant a motion for summary judgement, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Pro. **56**(c). "Facts that could alter the outcome are `material,' and disputes are `genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* **90 F.3d 737,** 743 (3d Cir. 1996) (citation omitted).

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson v. Liberty Lobby, Inc.,* **477 U.S. 242,** 255 (1986). In addition, "[a]ll justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy,* **90 F.3d at 744** (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.,* **914 F.2d 360,** 382 n. 12 (3d Cir. 1990). The non-movant must show more than "[t]he mere existence of a scintilla of evidence" for elements on which she bears the burden of production. *Anderson,* **477 U.S. at 252**. Thus, "[w]here the record taken as a whole could not
Page 8

lead a rational trier of fact to find for the non-moving party, there is no `genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citations omitted).

### III. DISCUSSION

A. Davis's racial discrimination claims

Davis asserts one claim for racial discrimination under Title VII,[fn5] § 1981,[fn6] and the PHRA[fn7] for discriminatory discharge.[fn8] A plaintiff may establish a cause of action for racial

Page 9

discrimination under these statutes with either direct or circumstantial evidence. *Skaggs v. Hartford Fin. Group, Inc.,* No. 99-3306, 2001 U.S. Dist. LEXIS 20351, at *11 n. 1 (E.D. Pa. Sept. 26, 2001); *Norris v. Lee,* No. 93-441, 1995 U.S. Dist. LEXIS 10142, at *10 (E.D. Pa. July 14, 1995). The Supreme Court set forth the analytical framework for employment discrimination cases based on circumstantial evidence in *McDonnell Douglas Corp v. Green,* 411 U.S. 792 (1973).[fn9] Under *McDonnell Douglas,* the plaintiff must first establish a prima facie case of discrimination. *Stanziale v. Jargowsky,* 200 F.3d 101, 105 (3d Cir. 2000) (citations omitted). If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the unfavorable treatment. *McDonnell Douglas,* 411 U.S. at 802. Once the employer comes forward with a legitimate, nondiscriminatory reason, to survive summary judgment, the plaintiff must demonstrate by a preponderance of the evidence "that the employer's articulated reason was not the actual reason, but rather a pretext for discrimination." *Simpson v. Kay Jewelers,* 142 F.3d 639, 644 n. 5 (3d Cir. 1998).

1. *Davis's prima facie case*

Page 10

To establish a prima facie case for discriminatory discharge, a plaintiff must show that: (1) she is a member of a protected class, (2) she was qualified for an employment position, (3) and she was discharged from that position "`under circumstances that give rise to an inference of unlawful discrimination.'" *Waldron v. SL Indus.,* 56 F.3d 491, 494 (3d Cir. 1995) (quoting *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981)). Mothers Work argues that Davis has failed to come forward with sufficient evidence of racial discrimination to satisfy the third element of the *prima facie* case. I disagree. "[T]he prima facie case under the *McDonnell Douglas-Burdine* pretext framework is not intended to be onerous." *Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir. 1995). The plaintiff need only present evidence that "give[s] rise to an inference of unlawful discrimination such as might occur when a person not of the protected class is [treated differently]." *Boykins v. Lucent Technologies, Inc.,* 78 F. Supp. 2d 402, 409 (E.D. Pa. 2000) (citing *Jones v. School Dist. of Philadelphia,* 198 F.3d 403, 410 (3d Cir. 1999)). Here, Davis has presented clear evidence that Worden treated Davis differently from Leister, a similarly

situated white employee. According to Davis and Bradley, Leister often wore clothing that violated Mothers Work's employee dress code, but Worden never asked her to leave the store to change out of the offending clothing, like she asked Davis. Further, Davis testified that despite Leister's frequent dress code violations, Worden did not closely monitor Leister's work, speak to her rudely, or give her nasty looks, which is how she allegedly treated Davis.**[fn10]**

Page 11

Because Davis's evidence suggests that Worden routinely treated Davis worse than a similarly situated white employee who also violated Mothers Work's employee dress code, a reasonable jury could infer that unlawful racial discrimination motivated Worden's ultimate decision to terminate Davis.**[fn11]**

Mothers Work also contends that Davis's racial discrimination claim must fail because Davis testified in her deposition that she did not believe that she was terminated on the basis of her race. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 10.) In her deposition, Davis testified that she did not believe that she was terminated on the basis of her race. (Davis Dep. at 100-01.) Nonetheless, Davis also testified that Worden regularly discriminated against her on the basis of her race. (*Id.* at 99-100.) I cannot conclude on the basis of this confused and conflicting testimony that Davis cannot state a prima facie case for racial discrimination. As I described above, Davis has proffered sufficient evidence apart from this portion of her deposition to create an inference that she was terminated because of her race. Davis's deposition testimony may affect her credibility at trial, but a jury, not the court, must resolve this evidence. *See Joseph v. Hess Oil*, **867 F.2d 179**, **183-84** (3d Cir. 1989) (finding that there was a material issue of fact where a witness made "apparently conflicting statements . . . nearly contemporaneously, in the same deposition").**[fn12]**

Page 12

Mothers Work also argues that any inference of discrimination based on Worden's conduct is unwarranted because Worden hired Davis. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 10-11.) Mothers Work relies on the Fourth Circuit's decision in *Proud v. Stone*, **945 F.2d 796**, **797** (4th Cir. 1991), which held that "where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." Mothers Work reliance on *Proud* is misplaced for various reasons. First, there is a factual dispute as to whether Worden actually hired Davis. Davis testified that she was hired by Parrish. Worden, on the other hand, testified that she hired Davis. This dispute creates a genuine issue of material fact that cannot be resolved at this stage of the litigation. Further, even if there were no issue of material fact, Mothers Work's reliance on *Proud* is misplaced because the Third Circuit has expressly declined to adopt the presumption established in *Proud*. *See Waldron*, **56 F.3d at 496** n. 6 ("[W]here, as in *Proud*, the hirer and firer are the same and the discharge occurred soon after the plaintiff was hired, the defendant may of course argue to the factfinder that it should not find discrimination. . . . this is simply evidence

like any other and should not be accorded any presumptive value.")

2. *Pretext analysis*

Once a plaintiff has established a prima facie case, an employer may defeat the inference of discrimination by offering a legitimate, nondiscriminatory reason for the unfavorable employment decision. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994). Mothers Work has satisfied its burden of production by coming forward with evidence that it terminated Davis's employment because she violated its "no call/no show" policy. (*See* Worden Dep. at 103; Davis
**Page 13**
Decl. at ¶ 23.)

After the employer comes forward with a legitimate, nondiscriminatory reason, to survive summary judgment, the plaintiff must demonstrate by a preponderance of the evidence "that the employer's articulated reason was not the actual reason, but rather a pretext for discrimination." *Simpson,* 142 F.3d at 644 n. 5 (3d Cir. 1998). The plaintiff may show pretext by pointing to some direct or circumstantial evidence, "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 644 (quoting *Fuentes,* 32 F.3d at 764). "If the plaintiff produces sufficient evidence of pretext, he need not produce additional evidence of discrimination beyond his prima facie case to proceed to trial." *Sempier,* 45 F.2d at 731. "To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken. . . ." *Fuentes,* 32 F.3d at 765. Instead, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . . . that a reasonable factfinder could rationally find them unworthy of credence." *Id.* (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 531 (3d Cir. 1993).

Davis claims that she did not violate Mothers Work's "no call/no show" policy because she called in sick on August 16 and August 18 and she was not scheduled to work again until August 21, when she arrived at work and was told to go home. (*See* Davis Decl. at ¶¶ 17-18; Davis Dep. at 134.) Mothers Work has presented evidence that Davis was scheduled to work on August 19 and failed to appear. (Ex. 3 to Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J.) This dispute creates an issue of material fact that cannot be resolved at this stage of the
**Page 14**
litigation, and for this reason alone, Davis's racial discrimination claim must survive summary judgment. *See* Fed.R.Civ.P. 56(c) (providing that summary judgment may only be rendered if the evidence "show[s] that there is no genuine issue as to any material fact").

Moreover, even if there were no genuine issue of material fact, Dean has presented additional evidence to suggest that Mothers

Work's proffered explanation is a pretext for unlawful discrimination. Bradley testified that Worden frequently ordered Parrish to change Davis's work schedule without notifying Davis, which suggests that Worden may have set Davis up to break the "no call/no show" policy by assigning her to work on August 19 without her knowledge. Further, despite the fact that Mothers Work maintains multiple copies of its employee's work schedules, (Worden Dep. at 38-39), Mothers Work has failed to produce these records to support its claim that Davis violated the "no call/no show" policy. After its investigation into Davis's claims, the EEOC concluded that Mothers Work's "lack of documentation seriously impairs [its] defense to [Davis's] allegations" and "shows a lack of credibility on the part of [Mothers Work]." (Ex. 23 to Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J.). For these reasons, I will deny Mothers Work's motion for summary judgment with respect to Davis's racial discrimination claims.

B. Davis's religious discrimination claims

1. *Davis's prima facie case*

Mothers Work contests Davis's claim for religious discrimination[fn13] under Title VII and
**Page 15**
the PHRA for discriminatory discharge[fn14], [fn15] The elements of the prima facie case for discriminatory discharge based on race and are nearly identical to the prima facie case for discriminatory discharge based on religion. *Abramson v. William Paterson Coll.*, **260 F.3d 265, 281-82** (3d Cir. 2001). However, in religion cases, because an employee's religion will not always be apparent or documented, the plaintiff must also show that the employer knew of her religion. *See Geraci v. Moody-Tottrup, Int'l*, **82 F.3d 578, 581** (3d Cir. 1996).

Davis can easily establish a prima facie case of religious discrimination. As a Muslim, she is a member of a protected class, and she was discharged from her position at Mothers Work under circumstances that give rise to an inference of discrimination. Davis has come forward with substantial evidence that Worden routinely treated Davis differently than other employees because of her religious attire. For instance, Worden sent Davis home from work on June 26, 2002 specifically to change out of her religious overgarments. (I must accept Davis's version of the facts for this purpose.) Additionally, Davis has presented evidence that Worden changed Davis's work-schedule, watched her closer than other employees, and made remarks about Davis's religious garb.
**Page 16**

Mothers Work contends that Davis's evidence fails to create the required inference of discrimination because there is no evidence that Worden treated Kane improperly, even though she also wore Islamic overgarments similar to Davis's. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 14.) This argument is unpersuasive because the testimony that Mothers Work relies on fails to show that Worden, the single Mothers Work employee who allegedly discriminated against Davis, ever saw Kane wearing overgarments. If Worden never saw Kane wearing religious garb, there is no evidentiary basis to infer that she knew Kane's religious

affiliation, and the fact that she never discriminated against Kane is irrelevant. Further, even if I assume that Worden knew that Kane wore Islamic overgarments and did not discriminate against her, this has no bearing on whether Worden discriminated against Davis on the basis of her religion. Cf. *O'Connor v. Consol. Coin Caterers Corp.*, **517 U.S. 308, 312** (1996) ("The fact that one person in the protected class has lost out to another person in the protected class is . . . irrelevant, so long as he has lost out because of his age."); *Cline v. Gen. Dynamics Land Sys.*, **296 F.3d 466, 472** (6th Cir. 2002) ("[T]he fact that some members within the protected class were beneficiaries of the discriminatory action of which other members of the protected class . . . were victims, does not somehow suspend the language of the statute, which prohibits age discrimination against `any individual' within the protected class.").

Mothers Work also contends that Davis cannot satisfy the knowledge requirement of the prima facie case because Worden makes the rather astonishing claim that she believed that Davis was a Mormon, not a Muslim. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 15.) This argument is equally unconvincing. First, there is an obvious factual dispute as to whether Worden truly believed that Davis was a Mormon. In her declaration, Davis testified that on the

Page 17

day that Worden approached her about her overgarments, she told Worden that she was wearing a "Muslim outfit."**[fn16]** (Davis Decl. at ¶ 7.) Worden, on the other hand, testified that she believed that Davis was wearing a "Mormon outfit." (Worden Dep. at 70.) This dispute creates a genuine issue of material fact that can only be resolved by a jury. Additionally, even if Worden truly believed that Davis was a Mormon, the evidence still suggests that she discriminated against Davis on the basis of her religion. Title VII does not require that the employer knew the plaintiff's specific religious beliefs. It only requires that the employer knew that the plaintiff was a member of a religion and that the employer discriminated against the plaintiff on the basis of that religion. Worden admits that she knew that Davis's overgarments were religious, and the evidence clearly suggests that Worden discriminated against Davis, and possibly fired her, because of Davis's overgarments. (Worden Dep. at 70.) For these reasons, Davis has come forward with more than enough evidence to satisfy a prima facie case of religious discrimination.

   2. *Pretext analysis*
Page 18

   As I explained above, Davis has come forward with sufficient evidence for a reasonable jury to conclude that Mothers Work's justification for Davis's termination was a pretext for unlawful discrimination. *See supra* Part III.A.2. Bradley's testimony that Worden frequently ordered Parrish to change Davis's work schedule without notifying Davis, along with Mothers Work's failure to produce the actual work schedules, suggests that Mothers Work's claim that Davis's violated its "no call/no show" policy is pretextual. Further, genuine issues of material fact remain with respect to Mothers Work's non-discriminatory explanation. For these reasons, I will deny Mothers Work's motion for summary judgment with respect to Dean's religious

discrimination claims.

C. Davis's retaliation claims

Davis asserts claims for retaliatory discharge[fn17] under § 1981, Title VII,[fn18] and the PHRA.
Page 19
She claims that Mothers Work discharged her in retaliation for her complaints about racial and religious discrimination.

1. *Davis's racial retaliation claims*

Section 1981 only protects employees from retaliation by their employers for opposition to *racial* discrimination in the workplace. See *Evans v. Kansas City Sch. Dist.*, 65 F.3d 98, 101 (8th Cir. 1995) ("Although `section 1981 has no specific retaliation provision,' we have recognized that it does encompass `allegations of retaliatory conduct' in a racial discrimination context.") (citation omitted). Hence, to sustain a retaliation claim under § 1981, Davis must come forward with evidence that she was retaliated against for her opposition to racial discrimination.

To establish a prima facie case of retaliation, "a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a
Page 20
causal link exists between the employee's protected activity and the employer's adverse action." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000).

The only evidence that Davis has presented to suggest that she engaged in a protected activity is testimony that she protested Worden's request that she remove her overgarments and accused Worden of religious discrimination. This evidence only supports a retaliation claim for opposition to religious discrimination. Hence, because Davis has failed to come forward with any evidence that she engaged in a protected activity in response to racial discrimination, I will enter judgment in favor of Mothers Work with respect to Davis's retaliation claim arising under § 1981.[fn19]

2. *Davis's religious retaliation claims*

a. *Exhaustion of administrative remedies*

Mothers Work contends that Davis has failed to exhaust her administrative remedies for her Title VII[fn20] retaliation claims because these claims exceed the scope of her EEOC charge. Before a plaintiff may file suit under Title VII, she must exhaust her administrative remedies by filing a formal charge with the EEOC or the Pennsylvania Human Relations Commission ("PHRC").[fn21] See 42 U.S.C. § 2000e-5(c). The scope of a suit under Title VII is accordingly
Page 21
limited by the charge filed with the administrative agency "or the investigation arising therefrom." *Waiters v. J.L.G.*

*Parsons,* 729 F.2d 233, 237 (3d Cir. 1984).

Neither Davis's charge of discrimination nor the EEOC's post-investigation determination contains any factual allegations that support a retaliation claim. Davis argues that she properly put the EEOC on notice of her retaliation claim in her intake questionnaire and her October 28, 2002 interview, and the EEOC mistakenly excluded this claim from the charge and its subsequent investigation.[fn22] Several courts in this circuit have looked past shortcomings in formal EEOC charges when an employee fairly presented a claim, and the claim was omitted due to the EEOC's negligence. In *Hicks v. ABT Assoc., Inc.,* 572 F.2d 960 (3d Cir. 1978), the plaintiff filed a charge alleging racial discrimination with the EEOC and later brought a Title VII suit alleging racial and sex discrimination. The court excused the absence of a sex discrimination claim in the charge because there was evidence that the plaintiff attempted to amend his charge to include such a claim, and there was sufficient evidence to "raise[] a genuine issue of whether the EEOC refused to accept [the] amendment." *Id.* at 964. The court reasoned that an "individual employee should not be penalized by the improper conduct of the [EEOC]." *Id.* at 964-65. In *Martinez v. Quality Value Convenience, Inc.,* No. 96-7715, 1998 U.S. Dist. LEXIS 15685, at *3-*4 (E.D. Pa. Sept. 29, 1998), the plaintiff marked the boxes labeled "race," "national origin," and "age" on his intake questionnaire, but the EEOC only checked the "age" box on the plaintiff's formal charge. The court, relying on *Hicks,* permitted the plaintiff to go forward with

Page 22

his race and national origin claims despite the insufficiency of the charge, because it found that the plaintiff's "intake questionnaire raise[d] the question whether a reasonable inquiry into [the plaintiff's] allegations should have encompassed [these claims]."[fn23] *Id.* at 7. Similarly, in *Smith v. Video Monitoring Servs. of Am, L.P.,* No. 98-4939, 2000 U.S. Dist. LEXIS 15518, at *12 (E.D. Pa. Oct. 3, 2000), the plaintiff provided the PHRC with information to support a sexual harassment claim, but the PHRC excluded these allegations from the formal charge based on its own assessment of the case. When the plaintiff discovered that the sexual harassment claim had been omitted, she contacted a lawyer who asked the PHRC to amend the charge, but the PHRC failed to take any remedial action. *Id.* The court, relying in part on *Hicks,* determined that the plaintiff's charge satisfied Title VII's filing requirements despite its technical insufficiency. *Id.* at *12-*13. Finally, in *Little v. SEPTA,* No. 01-4986, 2003 U.S. Dist. LEXIS 5512, at *13 (E.D. Pa. Apr. 3, 2003), the EEOC failed to include a retaliation claim in the plaintiff's formal charge, despite the fact that the plaintiff allegedly told two EEOC employees that she was terminated in retaliation for her complaints about disability discrimination. The court determined that the plaintiff's retaliation claims could proceed because "the EEOC's failure to investigate retaliation in light of plaintiff's comment to the investigator . . . was unreasonable." *Id.* at *14.

Here, Davis has come forward with sufficient evidence to "raise a genuine issue" of

Page 23

whether she properly presented her retaliation claim to the EEOC, and the EEOC unreasonably failed to include the claim in her formal charge. *Hicks,* **572 F.2d at 964**. Davis's allegation in her intake questionnaire that she told Worden that her overgarments were required by her religion suggests that Davis engaged in a protected activity. *See Hartman v. Sterling, Inc.,* No. 01-2630, 2003 U.S. Dist. LEXIS 18140, at *26-*27 (E.D. Pa. Sept. 11, 2003) ("An acceptable form of protected activity under Title VII are informal protests of discriminatory employment practices, including making complaints to management.") (citation omitted). On October 28, 2002, Davis again described her opposition to Worden's actions and told the EEOC investigator that she had been terminated less than two months after her protests.**[fn24]** (Davis Decl. at ¶ 13.) This evidence, viewed in the light most favorable to Davis, suggests that Davis presented facts that reasonably support a retaliation claim to the EEOC, and the EEOC improperly failed to include a such claim in Davis's formal charge, or to investigate these allegations. For this reason, I will excuse the deficiency in Davis's formal charge and reach the merits of her retaliation claim.

b. *Prima facie case*

Davis can easily establish the first two elements of the prima facie case. As I described
Page 24
above, Davis's protests to Worden about religious discrimination constitute protected activity,**[fn25]** and Mothers Work undoubtedly "took an adverse employment action" when it fired her.

To satisfy the final prong of the prima facie case, Davis must show that "a causal link exists between the employee's protected activity and the employer's adverse action." *Farrell,* **206 F.3d at 279**. The Third Circuit has recognized two fundamental considerations that can satisfy the "causal link" requirement: "timing and evidence of ongoing antagonism." *Abramson,* **260 F.3d at 288**. Both of these considerations clearly establish a "causal link" between Davis's protests and her termination. Davis was discharged on August 23, 2002, less than two months after she protested Worden's discriminatory conduct. Further, Davis has presented substantial evidence of "ongoing antagonism" that began after her confrontation with Worden. Following the June 26, 2002 incident, Worden began closely monitoring Davis's work, speaking to her "rudely," and giving her "nasty" looks. Additionally, Davis and Bradley both testified that Worden began ordering the store manager to change Davis's work schedule without notifying Davis. This evidence is more than sufficient to permit a reasonable jury to infer that Mothers Work terminated Davis in retaliation for her protests and complaints about religious discrimination.
Page 25

c. *Pretext analysis*

As I explained above, Davis has also come forward with sufficient evidence to permit a reasonable jury to conclude that Mothers Work's claim that Davis was fired for violating its "no call/no show" policy was a mere pretext for unlawful

discrimination or retaliation. *See supra* Part III.A.2. Thus, I will deny Mothers Work's motion for summary judgment with respect to Davis's religious retaliation claims under Title VII and the PHRA for retaliatory discharge and for Davis's unfavorable schedule changes.

**IV. CONCLUSION**

For the reasons explained above, I will enter judgment in favor of Mothers Work with respect to all of Davis's racial retaliation claims and Davis's religious retaliation claim for being sent home from work on June 26, 2002, and I will deny the balance of the motion. An appropriate order follows.

**Page 26**

**ORDER**

AND NOW, this ____ day of August, 2005, upon consideration of defendant Mothers Work's motion for summary judgment and memorandum of law in support thereof (Doc. No. 20), plaintiff Betty Davis's memorandum of law in opposition thereto (Doc. No. 22), and defendant's reply memorandum of law in further support of its motion (Doc. No. 24), it is hereby ORDERED that defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART as follows:

1. Davis's claim for wrongful discharge in Count III of the amended complaint is voluntarily dismissed by Davis.

2. The motion is DENIED as to Davis's claims of racial discrimination under § 1981, Title VII, and the PHRA based on her being sent home from work on June 26, 2002, alterations in her work schedule, and her termination on August 23, 2002.

3. The motion is DENIED as to Davis's claims of religious discrimination under Title VII and the PHRA based on her being sent home from work on June 26, 2002, alterations in her work schedule, and her termination on August 23, 2002.

**Page 27**

The motion is GRANTED as to these claims to the extent that they are based on § 1981.

4. Davis's retaliation claims:

a. The motion is GRANTED as to all retaliation claims based on § 1981.

b. The motion is GRANTED as to all retaliation claims based on Davis's being sent home from work on June 26, 2002.

c. The motion is GRANTED as to all claims of racial retaliation under Title VII and the PHRA based on alterations of Davis's work schedule.

d. The motion is DENIED as to claims of religious

retaliation under Title VII and the PHRA based on
alterations of Davis's work schedule.

e. The motion is GRANTED as to all claims of racial
retaliation under Title VII and the PHRA based on
Davis's discharge.

f. The motion is DENIED as to all claims of religious
retaliation under Title VII and the PHRA based on
Davis's discharge.

5. Trial is SCHEDULED for October 3, 2005 at 10:00
a.m.

[fn1] In her amended complaint, Davis also seeks relief under
Pennsylvania common law for wrongful discharge. However, in her
memorandum of law in opposition to defendant's motion for summary
judgment, Davis agrees to withdraw this claim. (Pl.'s Mem. of Law
in Opp. to Def.'s Mot. for Summ. J. at 8.)

[fn2] Davis's responsive brief is in violation of the court's
scheduling order limiting briefs to twenty-five pages in length.
Any future briefs filed in violation of the scheduling order will
be automatically stricken.

[fn3] In Davis's memorandum of law in opposition to Mothers
Work's motion for summary judgment, counsel asserts that Davis
was hired as a full-time employee. (Pl.'s Mem. of Law in Opp. to
Def.'s Mot. for Summ. J. at 13.) However, Davis fails to attach a
complete copy of the evidence she cites in support of this claim.
Further, in Davis's own declaration, she states that she was
hired as a "Part-time Supervisor." (Davis Decl. at ¶ 2.) For
these reasons, and because "unsworn statements of counsel in
memoranda submitted to the court" are insufficient to sustain a
plaintiff's burden at summary judgment, *Schoch v. First Fid.
Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990), I will assume that
Davis was hired as a part-time employee.

[fn4] The policy actually states that management should
"[c]ontact the Human Resources Department for any religious
issues *not relating* to [the dress code] policy." (Ex. to Worden
Decl.) (emphasis added). Mothers Work appears to interpret this
language to mean that management should contact Human Resources
when religious issues arise *in relation* to the policy. (*See*
Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 5; Worden
Decl. at ¶ 24.) Thus, for the purposes of this motion, I will
disregard the actual language and accept Mothers Work's reading
of its own policy.

[fn5] Title VII provides that "it shall be an unlawful employment
practice for an employer to fail or refuse to hire or to
discharge any individual, or otherwise to discriminate against
any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such
individual's race, color, religion, sex, or national origin."
42 U.S.C. § 2000e-2(a)(1).

[fn6] Section 1981 provides that "all person within . . . the
United States shall have the same right in every State and

Territory to make and enforce contracts . . . as is enjoyed by white persons. . . ." **42 U.S.C. § 1981.**

[fn7] The relevant provision of the PHRA provides that "[i]t shall be an unlawful discriminatory practice . . . [f]or any employer because of the race, color, [or] religious creed . . . of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract. . . ." Pa. Stat. Ann., Tit. 43, § 955(a).

[fn8] Davis asserts two additional racial discrimination claims on the basis of being sent home from work on June 26, 2002, and on the basis of the unfavorable changes to her work schedule. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 19.) These are both adverse employment actions sufficient to state a discrimination claim because Davis allegedly lost wages as a result of these actions. *See, e.g., Satterfield v. UPS,* No. 00-7190, 2003 U.S. Dist. LEXIS 17229, at *43-*44 (S.D.N.Y. Sept. 30, 2003) ("[P]laintiff arguably has shown that she was subjected to an adverse employment action when she was suspended, presumably without pay, for one day in March 1999."); *Parkinson v. Anne Arundel Med. Ctr., Inc.,* **214 F. Supp. 2d 511, 518** (D. Md. 2002) ("Plaintiff's one-day, unpaid suspension . . . could constitute an adverse employment action."); *but see Rose v. Buckeye Telesystem, Inc.,* **181 F. Supp. 2d 772, 777** (N.D. Ohio 2001) ("Plaintiff's one-day suspension with pay does not constitute an adverse employment action.") Because Mothers Work does not address these claims in its moving papers, I will assume that it does not contest their validity, and I will deny Mothers Work's motion with respect to these claims.

[fn9] "The *McDonnell Douglas* framework applies equally to Title VII, PHRA, and § 1981 claims." *Boyer v. Johnson Matthey, Inc.,* No. 02-8382, 2005 U.S. Dist. LEXIS 171, at *16 n. 6 (E.D. Pa. Jan. 6, 2005) (citations omitted); *see also Jones v. School Dist.,* **198 F.3d 403, 410** (3d Cir. 1999).

[fn10] Mothers Work contends that this evidence fails to establish that Worden discriminated against Davis because there is no evidence that Worden knew about Leister's dress code violations. (Def.'s Reply Mem. of Law in Supp. of Mot. for Summ. J. at 5.) Davis testified that Leister "always" wore tight-fitting shirts that exposed her "midriff," which violates the employee dress code. (Davis Dep. at 280.) Davis also testified that Worden and Leister often conversed and went out to lunch together. (*Id.* at 243.) Based on this evidence, a reasonable jury could easily infer that Worden knew about Leister's dress code infractions.

[fn11] Mothers Work also suggests that Davis cannot state a prima facie case of racial discrimination because she never complained about such discrimination. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 12.) While Davis's failure to complain about racial discrimination may affect her ability to state a prima facie case for race-based retaliation, it does not preclude her

from presenting evidence to show that Mothers Work's terminated her because of her race.

[fn12] Whether Davis is making a wise tactical decision in pursuing a claim which is demonstrably much weaker than her religious discrimination claims is, of course, not an issue for the court.

[fn13] Employees may assert two different theories of religious discrimination under Title VII: "disparate treatment" and "failure to accommodate." *Abramson v. William Paterson Coll.*, 260 F.3d 265, 281 (3d Cir. 2001). Here, because Davis does not allege that Mothers Work failed to accommodate her religious beliefs, and because the evidence suggests that Mothers Work allowed Davis to wear her overgarments to work after June 26, 2002, I will assume that Davis intends to proceed under the "disparate treatment" theory of religious discrimination.

[fn14] To the extent that Davis intends to bring a religious discrimination claim under § 1981, that claim is dismissed because it is well established that § 1981 does not cover religious discrimination. *St. Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 606 (1987).

[fn15] Davis asserts two additional religious discrimination claims on the basis of the fact that she was sent home from work on June 26, 2002 and she was subjected to unfavorable schedule changes. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 19.) Again, Mothers Work has failed to address these claims, and thus I will deny its motion for summary judgment to the extent that it contests these claims.

[fn16] Mothers Work contends that the court should disregard this statement from Davis's declaration pursuant to the "sham affidavit" doctrine. Under this doctrine, a court may disregard "`an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony.'" *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (citation omitted). Here, Davis' declaration is not truly inconsistent with her prior deposition testimony. In her deposition, Davis testified that she told Worden that she wore the overgarments because of her religion, but Davis did not indicate whether she revealed her specific religion to Worden. (Davis Dep. at 164.) In her declaration, Davis asserts that she specifically told Worden that her overgarments were a "Muslim outfit." (Davis Decl. at ¶ 7.) Because Davis's declaration merely clarifies her earlier deposition testimony, I will refrain from applying the "sham affidavit" doctrine, and I will consider Davis's declaration. *See Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980) (concluding that a subsequently filed affadavit was not a "sham" because the "affidavit did not purport to raise a new matter, but rather to explain certain aspects of [the affiant's] deposition testimony.").

[fn17] Davis also asserts two additional retaliation claims on the basis of the fact that she was sent home and she was subjected to unfavorable schedule changes. (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. at 19.) However, Davis's version

of the facts does not indicate that retaliation played any role in Worden's decision to send Davis home on June 26, 2002. According to Davis, she protested Worden's alleged religious discrimination *after* Worden ordered to her to go home and change out of her overgarments. (Davis Dep. at 158-59.) Because Davis engaged in a protected activity after Worden took an adverse employment action, Davis cannot establish a prima facie case of retaliation based on Worden's decision to send her home. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279 (3d Cir. 2000) (requiring that "the employer took an adverse employment action after or contemporaneous with the employee's protected activity"). For this reason, I will enter judgment in favor of Mothers Works with respect to Davis's retaliation claims for being sent home from work on June 26, 2002.

Mothers Works argues that Davis cannot state a retaliation claim on the basis of her unfavorable schedule changes because such actions do not constitute adverse employment actions for the purposes of a retaliation claim. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 7.) In support of this argument, Mothers Work relies on a recent district court case from outside of this district, *Prince v. Howmet Corp.*, No. 03-5434, 2005 WL 1106548 (D.N.J. Apr. 29, 2005). In *Prince,* the plaintiff alleged that his employer transferred him to the "graveyard" shift in retaliation for his complaints about racial discrimination. *Id.* at *5. The schedule change, however, "did not result in any loss of pay . . . or modify [the plaintiff's] responsibilities." *Id.* The court found that the plaintiff's "move to the `graveyard' shift . . . did not impact his compensation, terms, conditions or privileges of employment." *Id.* at *11. Nonetheless, contrary to Mothers Work's reading of the case, the court declined to decide whether the plaintiff's shift change alone could support a retaliation claim. *Id.* Further, even if the *Prince* court had explicitly determined that the plaintiff's schedule change did not constitute an adverse employment action, the facts in this case are readily distinguishable. Unlike the plaintiff in *Prince,* Davis lost wages as a result of her unfavorable schedule change. Hence, Davis's schedule change can support an additional claim for retaliation, and I will deny Mother Work's motion for summary judgment with respect to Davis's claim that she was subjected to unfavorable schedule changes in retaliation for her protests about religious discrimination. I will address Davis's claim that she was subjected to these schedule changes in retaliation for racial discrimination in Part III.C.1.

[fn18] Although I cannot find a claim for retaliation under Title VII in the amended complaint, because both parties assume that such a claim exists, I will assume for the purposes of this motion that Davis's amended complaint includes a cause of action for retaliation under Title VII.

[fn19] To the extent that Davis intends to a bring racial retaliation claim under Title VII and the PHRA claim, I will enter judgment in favor of Mothers Work's for these claims as well.

[fn20] Section 1981 does not require exhaustion of administrative remedies. *Wright v. Phila. Gas Works,* No. 01-2655, 2001 U.S. Dist. LEXIS 15852, at *15 (E.D. Pa. Oct. 2, 2001).

[fn21] Title VII provides that in a case involving an employer other than the federal government, the plaintiff must first file an administrative complaint with the state agency charged with enforcing employment discrimination law, if one exists. **42 U.S.C. § 2000e**. Davis fulfilled this requirement by filing a charge of discrimination with the EEOC, which in turn filed the charge with the Pennsylvania Human Relations Commission. (See Ex. 5 to Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J.)

[fn22] In the cases that Mothers Work relies on, there were no allegations of misconduct by the EEOC. See, e.g., Johnson v. Chase Home Fin., 309 F. Supp. 2d 667, 670-72 (E.D. Pa. 2004).

[fn23] Ordinarily, allegations in intake questionnaires do not receive the same treatment as allegations in formal charges and are insufficient to exhaust administrative remedies. See Park v. Howard Univ., **71 F.3d 904, 908** (D.C. Cir. 1995) ("[T]he pre-complaint questionnaire is not the same as an EEOC charge. . . ."); Yang v. AstraZeneca, No. 04-4626, 2005 U.S. Dist. LEXIS 1825, at *9 (E.D. Pa. Feb. 10, 2005) ("[M]aking allegations on the questionnaire is insufficient to exhaust administrative remedies. Rather, the allegations must appear in the formal charge signed by the claimant and served on the respondent.") (citations omitted).

[fn24] This allegation is curious because the same day that Davis allegedly described her retaliation claim to the EEOC investigator, she signed the formal charge, which does not include any hint of a retaliation claim. See Hathaway v. R.R. Donnelley Mendota, Inc., No. 01-3270, 2002 U.S. Dist. LEXIS 24655, at *21 (N.D. Ill. Dec. 20, 2002) (refusing to look beyond the plaintiff's formal EEOC charge to find a valid ADA claim because the plaintiff failed to "explain why he signed a charge that made no mention of [this claim]."). Nonetheless, because I must view this evidence in the light most favorable to Davis, I will assume that Davis signed the charge only after having made known to the EEOC investigator that she expected the Commission to pursue a retaliation claim on her behalf.

[fn25] Davis's complaint with the EEOC is also protected activity, but because there is no evidence that Mothers Work knew of these proceedings before Davis's termination, Davis cannot sustain a retaliation claim on the basis of this activity. See Jones, **198 F.3d at 415** (affirming the district court's grant of summary judgment in favor of the employer on the plaintiff's retaliation claim because there was no evidence that the employer knew of the plaintiff's previous EEOC filings); see also Cohen v. Fred Meyer, Inc., **686 F.2d 793, 796** (9th Cir. 1982) ("Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.") (citation omitted).

**Page 1**

Copyright © 2006 Loislaw.com, Inc. All Rights Reserved